IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

DANIEL J. SCOTT

      Plaintiff,

vs.

MARY BENSON, ARNP; JASON
SMITH, Director of CCUSO;
and CCUSO.

      Defendants.

No. 13-CV-4028-DEO

ORDER ON MOTION TO DISMISS
AND MOTIONS FOR TEMPORARY
INJUNCTION

_____

**TABLE OF CONTENTS**

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . 2

II.    BACKGROUND AND PROCEDURAL HISTORY . . . . . . . . . 2

III.   ISSUES . . . . . . . . . . . . . . . . . . . . . . . 8

IV.    TEMPORARY INJUNCTION STANDARD . . . . . . . . . . . 10

V.     ANALYSIS . . . . . . . . . . . . . . . . . . . . . 11
     A.  Medical Treatment . . . . . . . . . . . . . . . 11
     B.  Diet . . . . . . . . . . . . . . . . . . . . . . 23
     C.  Reimbursement for Medical Devices . . . . . . . 30
     D.  Motion to Dismiss CCUSO as a Defendant . . . . . 34
     E.  Authority to Remove Prostheses and Confiscate
        Wheelchair . . . . . . . . . . . . . . . . . . 35
     F.  Authority to Remove the Court's Number from Mr.
        Scott's Approved Number List . . . . . . . . . 37
     G.  Mr. Scott's Emergency Motion of October 15, 2013
        . . . . . . . . . . . . . . . . . . . . . . . 39
     H.  Possible Case Resolutions . . . . . . . . . . . 42

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . 46

## I.  INTRODUCTION

This matter is currently before the Court on Daniel Scott's [hereinafter Mr. Scott] Amended Complaint, Docket No. 11, requesting injunctive relief.  Mr. Scott is an involuntarily committed patient at the Civil Commitment Unit for Sex Offenders (CCUSO) in Cherokee, Iowa.[1]  Also before the Court is the Defendants' Counter Claim.  Docket No. 12.  In their Counter Claim, the Defendants also request injunctive relief.

## II.  BACKGROUND AND PROCEDURAL HISTORY

Mr. Scott is a patient at CCUSO.  An Iowa jury found that he has a mental abnormality associated with being a sexually violent predator.  <u>In re Det. of Scott</u>, 742 N.W.2d 605 (Table) (Iowa Ct. App. 2007).  As set out in that case:

> The record made at trial reveals that in 1984 twenty-seven-year-old Scott took a customer back to his tow-service business and forced her to perform oral sex upon him.  He pled guilty to third-degree kidnapping and sexual abuse in exchange for receiving immunity from other sexual assaults that were committed around this

---

[1]  The patients at CCUSO "have served their prison terms but in a separate civil trial have been found likely to commit further violent sexual offenses."  Iowa Department of Human Services Offer #401-HHS-014: CCUSO, http://www.dhs.state.ia.us/docs/11w-401-HHS-014-CCUSO.pdf, last visited December 9, 2013.

same time.  Scott was released from prison in the fall of 1989.

The following March, thirty-three-year-old Scott assaulted a female acquaintance by grabbing her breast and forcing her to place her hand on his exposed penis while he gave her a ride home.  He was convicted of assault with intent to commit sexual abuse and sentenced to prison.

After his release from prison, Scott lost his left leg in a motorcycle accident and began working as a taxicab driver.  On September 2, 1997, forty-year-old Scott sexually assaulted a female passenger by grabbing her breasts in his cab.  The next day, he assaulted another female passenger in a similar manner.  Scott was convicted of assault with intent to commit sexual abuse and third-degree sexual abuse as an habitual offender.

The trial record also reveals Scott has an extensive history of non-sexual criminal acts commencing with theft of Christmas lights at age eleven.  By 1982, he had committed seven felony-grade thefts.  By the time of his first sexual assault conviction, Scott estimated he had written fifty to seventy fraudulent checks.  Over the course of his life, Scott has committed nearly 100 incidents of theft, forgery, fraudulent practice, harassment and disorderly conduct.

Scott, 742 N.W.2d 605 (Table) at 1-2.  Since his commitment to CCUSO, Mr. Scott has filed several suits before this Court. The relevant history is set out below.

On August 8, 2011, this Court conducted an initial review of a Complaint filed by Mr. Scott in the case 11-CV-4055-DEO. The Court appointed Mr. Scott an attorney and let his claim proceed on the following claims:

> (1) he is improperly required to follow certain dietary restrictions due to illness; (2) his electric wheelchair was improperly taken from him as a form of punishment; (3) his mail is being opened to confiscate contraband; (4) CCUSO has provided him insufficient handicap facilities; and (5) CCUSO has insufficient measures to prevent the spread of infectious disease, specifically, Methicillin-resistant Staphylococcus aureus, MRSA.

11-CV-4055-DEO, Docket No. 10. That case is still pending before the Court.[2] On February 2, 2013, the Defendants' attorney, Gretchen Kraemer, filed an Emergency Motion. 11-CV-4055-DEO, Docket No. 16. Ms. Kraemer stated that Mr. Scott's potassium was dangerously low because of his diabetes. Ms. Kraemer requested authority to transport and treat Mr. Scott against his will. Id. The Court granted the Defendants' Emergency Motion on the same day. 11-CV-4055-DEO, Docket No. 17.

---

[2] The Court's Order on the Defendants' Motion for Summary Judgment is currently on appeal before the 8th Circuit Court of Appeals.

On March 14, 2013, Ms. Kraemer filed another Emergency Motion stating that Mr. Scott was refusing treatment for an infection. Ms. Kraemer requested this Court allow the Defendants to treat Mr. Scott against his will. 11-CV-4055-DEO, Docket No. 58.

On March 15, 2013, the Court conducted a hearing regarding the Defendants' Emergency Motion. Both Mr. Parry, Mr. Scott's counsel, and Ms. Kraemer appeared by telephone. The Court advised the parties of the present Complaint, in which Mr. Scott argues that forced medication is a violation of his constitutional rights. The Court had originally received this Complaint in April of 2012. However, the Court did not consider it as a new Complaint, because it was captioned as a filing in 11-CV-4055-DEO. Pursuant to a standing order in 11-CV-4055-DEO, which stated that all filings must be made by counsel, the Court forwarded the filing to Mr. Parry. No further action was taken on it by either Court or counsel.

On March 18, 2013, the parties appeared for a second hearing on the Defendants' Emergency Motion. The Defendants supplied the Court a brief, arguing that because Mr. Scott is detained by the State, the Defendants have an interest in

preserving his life. Mr. Parry maintained that forcing medication on Mr. Scott was a violation of his constitutional rights, and, secondly, that even if some court could order Mr. Scott to receive medical treatment, the Federal Court did not have jurisdiction to do so. Based upon the serious nature of Mr. Scott's medical condition, and relying on the Defendants' brief, the Court entered an order (11-CV-4055-DEO, Docket No. 64), authorizing the Defendants to transport Mr. Scott to a hospital and treat his infection.

At the hearing on March 18, 2013, the Court also advised the parties of its intention to conduct an initial review of the present Complaint and to file it under the present heading, 13-CV-4028. Because of the serious nature of the issue, the Court advised counsel that it would conduct an emergency hearing as soon as Mr. Scott was medically able, regarding his request for a permanent injunction to prohibit the Defendants from forcing him to receive medical treatment. On April 3, 2013, the Court entered an Initial Review Order in the present case, 13-CV-4028. Docket No. 6. On May 17, 2013, the Plaintiff filed an Amended Complaint, Docket No. 11, requesting the injunctive relief. On June 6, 2013, the Defendants filed an Answer and Counter Claim. Docket No. 12.

On September 5, 2013, the Court traveled to the CCUSO unit in Cherokee, Iowa, and conducted a hearing on the Motions for (Preliminary/Temporary) Injunctive Relief contained in the Amended Complaint and Counter Claim, Docket No.'s 11 and 12.[3]  At the conclusion of that hearing, the Court instructed the parties to file briefs outlining their arguments, as well as proposed orders.  On September 11, 2013, the Defendants filed their post-hearing brief.  Docket No. 21. On September 20, 2013, the Plaintiff filed his post-hearing brief.  Docket No. 24.  On September 27, 2013, the Defendants filed a proposed order.  Docket No. 27.  On September 30, 2013, the Plaintiff filed his proposed order.  Docket No. 30. After the filing of the parties' proposed orders, the Court deemed the matter submitted and took the issues under advisement.

During the weekend of October 12, 2013, the Court received two phone calls from Mr. Scott complaining about a lesion on his hip and CCUSO's alleged failure to treat it.  On Monday, October 14, 2013, the Court advised the parties of

---

[3]  Although neither the Amended Complaint or the Counter Claim specifically request preliminary/temporary injunctions, the parties orally stated that their filings should be construed to request preliminary/temporary injunctions during the status conference held on July 31, 2013.  See Docket No. 17.

these ex-parte communications. See Docket No 31, Ex. 1. In response, the Defendants filed a Supplement on October 15, 2013. Docket No. 31. On that same date, the Plaintiff filed a request for an Emergency Hearing/Order. Docket No. 32. The Court conducted a telephonic hearing on the Emergency Motion on October 16, 2013.[4] After taking all the issues under consideration, the Court now enters the following.

## III. ISSUES

Mr. Scott's Amended Complaint raises numerous issues. Relevant to the present Motion for Temporary Injunction, the Court will address those issues addressed at the September 5, 2013, hearing and contained in Mr. Scott's post-hearing brief: 1) Mr. Scott requests an injunction prohibiting CCUSO from forcing unwanted medical care on him and allowing him to seek appropriate medical care exclusively from University of Iowa Hospital. 2) Mr. Scott requests an injunction prohibiting CCUSO from giving him a special "medical" diet/meal plan. 3) Mr. Scott requests an injunction prohibiting CCUSO from requiring reimbursement for medical devices such as prosthetic limbs.[5]

---

[4] Discussed in Section V(G), p. 39, below.

[5] At the hearing, Mr. Scott addressed other issues, such as his request for a walker and his request to have his

8

The Defendants' Counter Claim also raises numerous issues in the context of a Motion for Injunctive Relief. The Court will address those issues discussed during the September 5, 2013, hearing and contained in the Defendants' post-hearing brief, Docket No. 21. 1) The Defendants request an injunction allowing them to provide medically appropriate treatment for Mr. Scott, even if it is against his will. 2) The Defendants request the Court dismiss Mr. Scott's claim regarding his diet on res judicata grounds. 3) The Defendants request the ability to charge Mr. Scott 20% per pay period to be applied towards the cost of his medical device(s). 4) The Defendants argue that CCUSO is not a proper Defendant and should be dismissed form this case. 5) The Defendants request an injunction allowing them to remove Mr. Scott's prostheses or confiscate his wheelchair if medically necessary or necessary to protect the safety of CCUSO or other patients at CCUSO. 6) The Defendants request authority to remove the Court from Mr. Scott's list of approved phone numbers in an attempt to curtail the number of ex-parte communications between Mr. Scott and this Court. 7) Finally, the Defendants request the

---

electric wheelchair returned. It is the Court's understanding that those issues have been addressed and are now moot.

Court provide guidance regarding how these issues related to Mr. Scott be resolved in the future.

The last set of issues the Court will address in this Order are the issues raised and resolved during Mr. Scott's Emergency Hearing, conducted on October 16, 2013.

## IV.    TEMPORARY INJUNCTION STANDARD

The parties generally agree on the applicable standard regarding injunctive relief.  To grant an injunction, the Court must consider the four <u>Dataphase</u> factors: (a) threat of irreparable harm to the movant; (b) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (c) the probability that the movant will succeed on the merits; and (d) the public interest.  <u>Dataphase Sys., Inc. v. C.L. Sys., Inc.</u>, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  A preliminary injunction is an extraordinary remedy and burden of establishing the propriety of an injunction is on the movant.  <u>Watkins, Inc. v. Lewis</u>, 346 F.3d 841, 844 (8th Cir. 2003).  Of the factors, success on the merits has been referred to as the most important factor.  <u>Roudachevski v. All-American Care Centers, Inc.</u>, 648 F.3d 701, 706 (8th Cir. 2011) (citing <u>Kai v. Ross</u>, 336 F.3d 650, 653 (8th Cir. 2003)).  "To succeed in

demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" Roudachevski, 648 F.3d at 706 (quoting Iowa Utils. Bd. v. Fed. Commc'ns Cmm'n, 109 F.3d 418, 425 (8th Cir. 1996)).

Additionally, although the Court has orally raised questions about jurisdictional issues in this case, the parties seem to agree that the Court may reach these issues under the common 42 U.S.C. § 1983 analysis.

## V. ANALYSIS

### A. Medical Treatment

The first issue the Court will address is Mr. Scott's medical treatment. As discussed above, Mr. Scott would like an injunction allowing him to make decisions related to his medical treatment. Mr. Scott requests that he be allowed to seek treatment from providers of his choice (usually from the University of Iowa Hospital), refuse unwanted medication, and make determinations related to when he actually needs treatment.[6] On the other hand, the Defendants seek an injunction which would allow them to provide reasonable

---

[6] The Court notes that subsequent to the hearing in this case, Mr. Scott filed a lawsuit against the University of Iowa Hospital. See Docket No. 26, Ex. 1.

medical treatment to Mr. Scott, even when such treatment is against his will. The Defendants argue that Mr. Scott has a history of refusing medical treatment until his ailments have progressed to a dangerous level and such an injunction is necessary to protect both Mr. Scott and CCUSO as an institution.

In his Complaint, Mr. Scott states, "I am being forced to [receive] medical treatment against my will." Docket #1, Att. 1, p. 9. Because of the hearings conducted in 11-CV-4055-DEO, and the Orders entered in that case, the Court is aware of the veracity of Mr. Scott's allegation. To wit, this Court has entered orders in case 11-CV-4055 expressly allowing CCUSO to treat Mr. Scott against his will. Thus, the question the Court must answer in this Order is whether, under the Dataphase factors, outlined above, CCUSO should be allowed to continue to treat Mr. Scott against his will, or whether Mr. Scott should be allowed to choose where, and when, he receives medical treatment. As stated above, the most important Dataphase factor is likelihood of success on the merits. Roudachevski, 648 F.3d at 706. To determine likely success on the merits, the Court must consider the relevant case law regarding an individual's right to refuse treatment.

Many individual states have recognized a right to refuse medical treatment.[7]   As the Massachusetts Supreme Court stated, "[t]here is implicit recognition in the law ... that a person has a strong interest in being free from nonconsensual invasion of his bodily integrity." Superintendent of Belchertown State Sch. v. Saikewicz, 370 N.E.2d 417, 424 (Massachusetts 1977).[8]   That Court went on to say:

> Of even broader import, but arising from the same regard for human dignity and self-determination, is the unwritten constitutional right of privacy found in the penumbra of specific guaranties of the Bill of Rights.  As this constitutional guaranty reaches out to protect the freedom of a woman to terminate pregnancy under certain conditions, so it encompasses the right of a patient to preserve his or her right to privacy against unwanted infringements of bodily integrity in appropriate circumstances.

Superintendent of Belchertown State Sch., 370 N.E.2d at 424 (internal citations omitted).

---

[7]   The right to refuse medical treatment is commonly codified.  See for example Minn. Stat. Ann. § 144.651, Subdivision 12, stating that, "[c]ompetent patients and residents shall have the right to refuse treatment..."

[8]   See also Schloendorff v. Society of New York Hopsital, 105 N.E. 92 (N.Y. 1914); Steele v. Hamilton Cty. Cmty. Mental Health Bd., 736 N.E.2d 10; In re Brooks' Estate, 205 N.E.2d 435 (Ill. 1965).

Subsequently, the Supreme Court took up the issue of a constitutional right to refuse medical treatment and stated that:

> Just this Term, in the course of holding that a State's procedures for administering antipsychotic medication to prisoners were sufficient to satisfy due process concerns, we recognized that prisoners possess 'a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment.'... Still other cases support the recognition of a general liberty interest in refusing medical treatment... for purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition.

Cruzan by Cruzan v. Dir., Missouri Dept. of Health, 497 U.S. 261, 278-79 (1990)(internal citations omitted).  The dissent in that case argued that a person's right to refuse medical treatment was not just suggested by the due process clause, but is guaranteed by the constitutional right to privacy.  Id. at 302 (Justice Brennan dissenting).[9]  The Supreme Court

_____

[9]  Stating that: "[t]oday the Court, while tentatively accepting that there is some degree of constitutionally protected liberty interest in avoiding unwanted medical treatment, including life-sustaining medical treatment such as artificial nutrition and hydration, affirms the decision of the Missouri Supreme Court.... Because I believe that Nancy Cruzan has a fundamental right to be free of unwanted artificial nutrition and hydration, which right is not outweighed by any interests of the State... I respectfully

14

subsequently affirmed the (suggested) right to refuse treatment, stating, "[w]e have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720 (1997).

Additionally, the Supreme Court has repeatedly taken up the issue of whether, and to what extent, the Government can force a detainee to take antipsychotic medication. In those cases, the Court has concluded:

> the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

<u>Sell v. United States</u>, 539 U.S. 166, 179 (2003).[10]

---

dissent." <u>Cruzan</u>, 497 U.S. at 302 (Justice Brennan dissenting).

[10] In the same case, the Court stated, "[f]or another thing, courts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, Harper-type grounds. Every State provides avenues through which, for example, a doctor or institution can seek

Based upon those opinions, this Court is persuaded that Mr. Scott has a constitutional right to refuse treatment. The question becomes, does CCUSO have a countervailing interest that makes Mr. Scott's success on the merits less certain?

As the <u>Sells</u> Court noted, all jurisdictions provide a civil means to force medication on certain individuals. The Defendants' brief sets out that civil process in Iowa:

> In the more typical situation, a patient's right to refuse medication and treatment can be overcome by a showing that the patient is dangerous and that the person cannot make responsible decisions on the matter. In Iowa, there are two chapters dedicated to providing the due process around overriding a patient's liberty interest in refusing treatment. Iowa Code chapter 229 permits medication and treatment when the patient is determined to be seriously mentally impaired – the patient must have a mental illness, must be unable to make responsible treatment decisions, and must be a danger to self or others. Iowa Code § 229.1(17); <u>O'Connor v. Donaldson</u>, 422 U.S. 563, 576 (1975) (requiring proof of dangerousness) (establishing dangerousness criterion; need for treatment alone is not sufficient). Additionally, Iowa Code chapter 125 permits the involuntary treatment of chronic substance abusers. When a patient is not competent to make his or her own decisions, a guardian may be appointed to

appointment of a guardian with the power to make a decision authorizing medication when in the best interests of a patient who lacks the mental competence to make such a decision." <u>Sell</u>, 539 U.S. at 182.

> make substituted decisions under Iowa Code
> § 633.635. There is also a Board available
> to make one-time medical decisions for a
> person who is not competent to render those
> decisions himself, and who has no guardian.
> Iowa Code § 135.29.

Docket No. 21, p. 2-3. However, the parties agree that Mr.
Scott is mentally competent and that the civil procedures are
not applicable.

Unfortunately, it seems that no analogous situation has
been considered (and reported) by other courts. So the Court
must consider similar, if not precisely the same, situations.
As the Court stated in Docket No. 64 in 11-CV-4055, the Iowa
case of <u>Polk County Sheriff v. Iowa District Court for Polk
County</u>, 594 N.W.2d 421 (Iowa 1999) provides the Defendants
some support in their claim that they have an interest in
treating Mr. Scott against his will. In that case, the Iowa
Supreme Court stated:

> The issue is whether competent persons,
> while being held as pretrial detainees,
> have a constitutional right to refuse
> unwanted medical treatment... In balancing
> [detainee's] diminished liberty interest to
> refuse treatment against the State's
> countervailing interests in preserving
> life, preventing suicide, protecting the
> interests of innocent third parties,
> maintaining the ethical integrity in the
> medical profession, and maintaining prison

> security, order, and discipline, we
> conclude the State's interests must
> prevail.

Polk Cnty. Sheriff, 594 N.W.2d at 431. The Iowa Supreme Court

considered issues very similar to the arguments made by these

Defendants and stated that while the detainee would normally

have a right to refuse treatment, his unique status in custody

allowed the State's countervailing interest to prevail and

forced medication was allowed. However, it is worth noting,

that case was decided by a slim majority and was hotly

dissented from.

> The majority's application of the legal
> principles that are appropriate to this
> issue seriously diminishes, if not
> eliminates, to a pretrial detainee the
> liberty interest established by the United
> States Constitution. Under the majority's
> analysis, it would be extremely unlikely
> that any exercise of the liberty interest
> to refuse unwanted medical treatment would
> be upheld over a jailer's objection. This
> is because a jailer could always conjure up
> a fear that a prisoner's act of exercising
> his constitutional liberty interest would
> have a 'fallout' effect on other prisoners.
> This possible fallout effect allegedly
> would then cause serious adverse
> consequences to the jail's security, order
> and discipline requirements. As viewed by
> the majority, that possibility is enough to
> tip the scales under the balancing test and
> necessitate a jettisoning of the liberty
> interest of the United States Constitution.
> A possibility of fallout is all that the
> sheriff puts forth as evidence. Beyond

that, there is no foundational support in
fact for the premise that prison security,
order and discipline would be seriously
affected adversely if [detainee] were
allowed to exercise his constitutional
right.

Polk Cnty. Sheriff, 594 N.W.2d 431-32 (Snell Dissenting).

The Defendants set out other situations similar, but not
exactly the same, as Mr. Scott's.

See also Davis v. Agosto, 89 Fed. Appx. 523
(6th Cir. 2004) (permitting prison to
suture an open wound even if the inmate
disagreed, noting the prison could easily
face a deliberate indifference claim for
failing to treat the open wound); Parks v.
McCoy, 35 Fed. Appx. 239, 241 (7th Cir.
2002) (inmate forced to take tuberculosis
medication against his will based on a
misdiagnosis did not state a constitutional
claim for relief); People ex rel. Ill.
Dep't of Corr. v. Millard, 335 Ill. App. 3d
1066 (Ill. App. Ct. 2003) (holding Illinois
DOC does not violate an inmate's
constitutional rights in seeking a court
order to force feed an inmate on a hunger
strike); McCormick v. Stalder, 105 F.3d
1059, 1062 (5th Cir. 1997) (due process
does not prevent prison officials from
forcing a prisoner to undergo treatment for
tuberculosis); Martinez v. Turner, 977 F.2d
421, 423 (8th Cir. 1992) (rejecting
constitutional challenge to decision by
prison officials to force-feed a detainee
to preserve his health after a hunger
strike); State ex rel. Schuetzle v. Vogel,
537 N.W.2d 358, 364 (N.D. 1995) (future
medical cost of allowing diabetic prisoner
to refuse treatment justified forced
injections of insulin); Commissioner of
Corr. v. Myers, 399 N.E.2d 452, 454 (Mass.

19

> 1979) (permitting dialysis over inmate's
> objection); <u>Sconiers v. Jarvis</u>, 458 F.
> Supp. 37, 40 (D. Kan. 1978) ("[D]efendants
> had an affirmative constitutional duty to
> provide necessary medical treatment
> regardless of consent because intentional
> denial of medical treatment ... constitutes
> cruel and unusual punishment.").

Docket No. 21, p. 4-5.

Based on the foregoing case law, a few things seem clear. The Defendants' request for an injunction to generally treat Mr. Scott against his will has little chance to succeed on the merits. Mr. Scott has a constitutional right to refuse treatment. Although Courts in certain circumstances have allowed forced treatment (or found no damage after the fact from forced treatment) no authority binding on this Court has allowed an across the board injunction forcing the treatment of a patient in Mr. Scotts' situation. And it is unlikely that a Court would allow such an injunction in the future. As the dissent in the <u>Polk County</u> case implies, allowing such an injunction would all but negate Mr. Scotts' constitutional right. Accordingly, the Defendants' request for a temporary injunction to treat Mr. Scott against his will must be **denied**.

However, the Court will issue an injunction allowing forced treatment in one type of circumstance. There has been evidence that Mr. Scott has battled MRSA, a type of antibiotic

resistant infection, in the past. According to the Centers for Disease Control, MRSA is extremely dangerous and easily communicable in places such as prisons or mental hospitals. See Methicillin-resistant Staphylococcus Aureus (MRSA) Infections, http://www.cdc.gov/mrsa/index.html , last accessed on December 9, 2013. The Court will allow the forced treatment of MRSA infections (or the forced treatment of any other highly communicable disease such as whooping cough). Both the public interest and the risk of irreparable harm weigh in favor of stopping the spread of highly communicable, dangerous, diseases.

However, the Court will also deny Mr. Scott's request for an injunction giving him complete discretion to choose his medical treatment. Although it is clear that Mr. Scott has a constitutional right to refuse treatment, the cases cited above establish that in some situations courts have allowed forced treatment of patients and inmates. Accordingly, the Court cannot say with any great certainty that Mr. Scott would succeed on the merits, which is the most important Dataphase factor.

Additionally, the other Dataphase factors do not clearly weigh in favor of granting Mr. Scott an injunction.

Currently, the evidence establishes that Mr. Scott has the ability to make basic health care decisions. He is allowed to refuse medication so long as he signs a release form stating that he is refusing medication. The Court need not grant a temporary injunction to maintain the status quo. Moreover, the chance of irreparable harm in granting the motion is simply too great. "To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" <u>Roudachevski</u>, 648 F.3d at 706. If Mr. Scott is allowed to refuse all medication and treatment, in every situation, he could die. There is no harm more irreparable than death. Additionally, the public interest almost always favors the preservation of life. Balancing the two sides, not granting the motion has the lowest risk of harm. Accordingly, a temporary injunction is not appropriate in this situation and Mr. Scott's request is **denied**.

By denying both motions, the Court assumes that the status quo will be maintained, meaning, that Mr. Scott will continue to be able to refuse general treatment, such as medication, so long as he signs the appropriate waivers.

Additionally, the Defendants will make reasonable efforts to accommodate Mr. Scott's medical needs.  Finally, as has happened in the past, the Court expects that either party will petition the Court if a life threatening situation develops and either party feels the Court's intervention is necessary.

**B.  Diet**

The next issue relates to Mr. Scott's diet.  CCUSO admits that Mr. Scott gets meals specially designed for his medical needs.  Mr. Scott argues he should be allowed to eat meals that are not medically restricted.  Both sides make a request on this issue.  Mr. Scott requests an injunction allowing him to eat regular meals (and other, for lack of better term, 'junk' food when he has access to it).  The Defendants request an injunction allowing them to continue to give Mr. Scott medically restricted meals.  In the substance of their argument, the Defendants argue that this issue is precluded by the doctrine of res judicata, meaning, that this issue has already been decided.

The parties agree on several facts related to Mr. Scott's diet:  1) Mr. Scott has been able to maintain a more healthy weight on the special diet.  2) Mr. Scott still has access to 'junk' food on special occasions, such as the Super Bowl.  3)

Mr. Scott trades other patients for food. 4) The meals provided to Mr. Scott by CCUSO are nutritionally adequate. 5) Mr. Scott is allowed to buy fruits and vegetables to the same extent other patients in his phase are. In fact, there is very little regarding Mr. Scott's diet that the parties disagree about factually. The only dispute is whether Mr. Scott should continue to get medically restricted meals.

As set out in the Defendants' brief, Iowa law governs res judicata analysis. C.H. Robinson Worldwide, Inc. v. Lobrano, 695 F.3d 758, 764 (8th Cir. 2012) (law of forum that rendered first judgment controls res judicata analysis). Res judicata encompasses both claim and issue preclusion. Pavone v. Kirke, 807 N.W.2d 828, 835 (Iowa 2011). Claim preclusion bars further litigation after a valid and final judgment to prevent claims from being tried "piecemeal." Id. at 835-36. The elements of claim preclusion are easily satisfied in this case: (1) the parties in the first and second action are the same parties or in privity; (2) there was a final judgment on the merits in the first action, and (3) the second suit could have been fully and fairly adjudicated in the prior case. Id. at 836.

Issues related to Mr. Scott's diet were previously discussed in the case of 11-CV-4055-DEO, in 2012. The parties agree the parties are the same and that the issues are the same. (See Docket No. 24, p. 3, stating "[t]he Plaintiff admits that he previously sued for a preliminary injunction on the diet issue last year which were denied by Magistrate Judge Zoss and accepted by the District Court.").[11] In that case, Mr. Scott argued:

> The plaintiff ... seeks a preliminary injunction "that restricts the Defendants from placing any limitations on food beyond the standard CCUSO rules." Doc. No. 20 at 2. In particular, the plaintiff seeks to enjoin the defendants from "restricting [him] from buying food from outside vendors, and the CCUSO Commissary." Doc. No. 20-1 at 1... The plaintiff believed that the Constitution does not permit the defendants to restrict what food he may purchase or obtain from outside sources. He claimed that his weight loss is taking a toll on his body, although he conceded that his prescribed diet is not medically harming him, "but lots of times I don't get a lot on my tray." According to the plaintiff, his diet is causing him irreparable harm because it is hindering his progress through the treatment program at the CCUSO.

---

[11] To be clear, this Court adopted Judge Zoss' Report and Recommendation and thereby did not grant Plaintiff's request for a temporary injunction.

11-CV-4055, Docket No. 33, p. 4-5.    After considering the relevant _Dataphase_ factors discussed above, Magistrate Zoss denied Mr. Scott's request for injunctive relief.    _Id._  This Court adopted the Magistrate's Report and Recommendation shortly there after. 11-CV-4055, Docket No. 36.    There is no allegation that Mr. Scott's claim for a temporary injunction regarding his diet could not have been fully and fairly litigated in the earlier case.  Accordingly, all three factors for claim preclusion have been met:   the prior case had the same parties, had the same issue, and Mr. Scott had an opportunity to litigate his claim.

Mr. Scott now argues that, "[a]lthough that particular issue was resolved at that time, the circumstances here have changed over the course of the last year.    As ARNP Benson testified, "Scott has dropped [a] significant amount of weight and blood tests indicate that he is no longer diabetic." Docket No. 24, p. 3.  However, the mere fact that Mr. Scott is now healthier because he has followed the medically restricted diet does not alter the fact that this issue was fully and fairly litigated in the previous case.    Accordingly, the principle of claim preclusion applies and Mr. Scott's request for a temporary injunction related to his diet is **barred**.

Furthermore, even if the claim were not barred by issue preclusion, it is clear that Mr. Scott does not have a right to make decisions related to his diet at CCUSO. In section (A) above, at p. 27, the Court discussed Mr. Scott's constitutional right to make his own medical choices. While the Court cannot definitively say how that right interacts with CCUSO's interest in providing Mr. Scott medical care, there is no doubt that absent extenuating circumstances, Mr. Scott does have a right to make medical choices. No similar right exists which would compel CCUSO to feed Mr. Scott his menu of choice.

As set out in the Defendants' brief:

> even if Mr. Scott were on the phase and level that permitted ordering food from the community, which he is not, there is no Constitutional right to eat HyVee Chicken. Ayers v. Uphoff, 1 Fed. Appx. 851, 855 (10th Cir. 2001) (unpublished) (holding "plaintiff has no constitutional right to preselect foods or demand a certain variety of foods. In short, plaintiff's dissatisfaction with the menu at prison is not sufficient to support an Eighth Amendment claim."); Ellis v. Miller, 985 F.2d 559, 1993 WL 22448, at *1 (6th Cir. 1993) (unpublished) ("plaintiff has no constitutional right to food from a particular source."). "The [E]ighth [A]mendment assures prisoners a medically and nutritionally sound diet; it does not guarantee a pleasant culinary experience." Jackson v. Hanlon, 923 F.2d 856, 1991 WL

3056, at *1 (7th Cir. 1991) (unpublished).
Persons in confinement have no
constitutional right to be served a
particular type of meal. <u>Burgin v. Nix</u>,
899 F.2d 733, 734-35 (8th Cir. 1990).

Persons in confinement have no
constitutional right to purchase snacks or
gifts from the Commissary or similar
setting. <u>Tokar v. Armontrout</u>, 97 F.3d
1078, 1083 (8th Cir. 1996) ("[W]e know of
no constitutional right of access to a
prison gift or snack shop."); see <u>Gibson v.
McEvers</u>, 631 F.2d 95, 98 (7th Cir. 1980) (a
denial of a prisoner's commissary
privileges does not implicate due process);
<u>Partee v. Cain</u>, No. 92 C 4838, 1999 WL
965416, at *9 (N.D. Ill. Sept. 30, 1999)
(citing <u>Campbell v. Miller</u>, 787 F.2d 217,
222 (7th Cir. 1986) (finding no
Constitutional or statutory right to
commissary privileges)); <u>Mitchell v. City
of New York</u>, No. 10 Civ. 4121, 2011 WL
1899718, at *2 (S.D.N.Y. May 13, 2011)
(finding no constitutional right to access
the prison commissary); <u>Davis v. Shaw</u>, No.
08 Civ. 364, 2009 WL 1490609, at *1
(S.D.N.Y. May 20, 2009) (same). Mr. Scott
has no Constitutional right to purchase
food from local restaurants while confined
at CCUSO, nor does he have a constitutional
right to receive food from outside sources.

Quite the opposite is true. If CCUSO were
to disregard the medical recommendations
for a special diet for Mr. Scott, it would
risk exposure for liability. See <u>Byrd v.
Wilson</u>, 701 F.2d 592, 594-95 (6th Cir.
1983) (prison officials' deliberate
indifference towards inmate's special diet
can form basis for Eighth Amendment claim
if diet is medically necessary). Indeed,
the Eighth Circuit has upheld an
institution's right to force-feed an inmate

> if it is determined that the inmate's life
> or permanent health is in danger. <u>Martinez
> v. Turner</u>, 977 F.2d 421, 423 (8th Cir.
> 1992).

Docket No. 21, p. 7-8.

It is undisputed in the record that CCUSO has designed a diet plan for Mr. Scott based on medical recommendations. As the foregoing analysis from the Defendants' brief makes clear, there is no right or requirement that would force CCUSO to provide Mr. Scott the meals of his choice. Providing Mr. Scott with food is different from forcing medical care on Mr. Scott. CCUSO has a responsibility to provide Mr. Scott food that is nutritionally sufficient. CCUSO is doing that, even if Mr. Scott would rather have better tasting, but less healthy food. Even if CCUSO had to absolutely and completely abide by Mr. Scott's choices regarding his medical treatment, that would not confer upon CCUSO an affirmative obligation to provide Mr. Scott food they know would be unhealthy for him. Accordingly, applying the <u>Dataphase</u> factors set out above, it is clear that Mr. Scott has virtually no chance of success on the merits of this matter. Moreover, there is no risk of irreparable harm from continuing to allow CCUSO to provide Mr. Scott a medically restricted diet. There is no public interest in this issue. On balance, CCUSO is correct that by

allowing Mr. Scott to eat whatever he likes, regardless of medical advice, they could be opening themselves up for liability under the deliberate indifference standard. Accordingly, the balance tips in favor of denying Mr. Scott's request for injunctive relief.

For all those reasons, Mr. Scott's requested injunctive relief regarding his diet is **denied**. The Defendants may continue to provide Mr. Scott a medically restricted diet so long as it is nutritionally sufficient and comports with medical advice.

## C. Reimbursement for Medical Devices

Next, the Defendants request an injunction allowing them to require Mr. Scott to reimburse CCUSO for medical devices CCUSO purchases on his behalf. As set out in the Defendants' brief:

> CCUSO typically recovers 20% of the patient's pay each pay period under repayment agreements. Mr. Scott currently earns $16 per pay period, so he will be paying $3.20 per pay period toward his new prosthetics. The current cost of the prostheses is $16,942.00; there may be other fitting expenses. Although the statute grants the program authority to recoup costs of confinement, the program has not billed patients who are released with supervision or who are discharged. To the contrary, the program incents positive behavior and treatment performance with an

> allowance that increases as a patient
> advances through the program.  The program
> encourages patients to save this allowance
> so that when the patient reaches release
> with supervision or discharge, the patient
> has savings for things like rental
> deposits.[12]

Docket No. 21, p. 9.  The Defendants go onto state that "It is important that Mr. Scott have some vested interest in maintaining his prostheses.  Dr. Smith testified at the hearing that Mr. Scott threw one of his prosthetics in the garbage.  He has also destroyed a small wheelchair access ramp and admittedly kicked down a partition.  If Mr. Scott has no interest in his prostheses, he could destroy them and demand another pair."  Docket No. 21, p. 9.

As the parties are well aware, Iowa Code Chapter 229A establishes the statutory grounds for confining sexually violent predators.  The Defendants argue that the code allows them to charge patients for certain expenses CCUSO pays on the patients' behalf.  Specifically:

> Reimbursement may be obtained by the
> director from the patient and any person
> legally liable or bound by contract for the
> support of the patient for the cost of
> confinement or of care and treatment

---

[12]  The Court understands this repayment plan will not result in a full repayment, but rather is a means, pursuant to CCUSO's regulations, to encourage Mr. Scott to take responsibility for the equipment.

> provided. To the extent allowed by the
> United States social security
> administration, any benefit payments
> received by the person pursuant to the
> federal Social Security Act shall be used
> for the costs incurred.

I.C.A. § 229A.12. Thus, the Iowa Legislature clearly contemplated CCUSO's ability to recoup some costs from patients.

The Plaintiff concedes that CCUSO has a statutory authority to recoup certain costs. (See Docket No. 24, p. 4, stating, "Scott acknowledges CCUSO's authority to seek reimbursement."). However, Mr. Scott argues that this reimbursement plan creates an undue burden on Mr. Scott.

Again, to determine if an injunction is appropriate, the Court considers four factors: (a) threat of irreparable harm to the movant; (b) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (c) the probability that the movant will succeed on the merits; and (d) the public interest. As stated above, factor (c) is the most important.

In this situation, the Defendant is likely to succeed on the merits. I.C.A. § 229A.12 clearly authorizes CCUSO to obtain reimbursement from patients for the cost of confinement

or care.[13] While Mr. Scott is correct that at some point such a scheme could become an undue burden, and implicate Mr. Scott's due process rights, there is no evidence the 20% percent repayment plan that CCUSO uses represents an undue burden.

Turning to the other factors, the public interest supports this injunction. The State of Iowa subsidizes CCUSO, and recouping some cost is in the public interest, as is giving Mr. Scott a vested interest in maintaining his prostheses and wheelchair. It is indisputable, based on the evidence presented during the hearing, that Mr. Scott has a history of using his wheelchair and prostheses in a reckless and destructive manner. In the past, Mr. Scott has become angry and used his equipment to threaten other patients and damage CCUSO property. Consequently, providing Mr. Scott a financial interest in maintaining his medical devices will (hopefully) encourage Mr. Scott to use those devices in a

---

[13] However, this statute does NOT authorize CCUSO to require contemporaneous payments for medical treatment. CCUSO has a statutory and constitutional duty to provide patients medical care, regardless of their ability to pay. It is only after care has been provided, or in this case, after prostheses have been provided, that CCUSO may attempt to obtain reimbursement. To be clear, CCUSO CANNOT use lack of payment as a reason to deny Mr. Scott a medically necessary device.

responsible manner. If Mr. Scott uses his medical equipment responsibly, he will likely reduce the public cost incurred when CCUSO has to replace/repair his wheelchair and prostheses.

Similarly, the threat of harm to Mr. Scott does not outweigh the benefit of having him pay some of the cost of his medical equipment. While Mr. Scott will be out some money, and thus harmed, Mr. Scott will also be given incentive to maintain both his health and the medical equipment he has. To sum up, the public, Mr. Scott, and the Defendants all benefit from encouraging Mr. Scott to take care of his medical assistance devices. Accordingly, all four <u>Dataphase</u> factors support the Defendants' requested injunction, allowing them to recoup some medical equipment costs from Mr. Scott. The partial payment assessed by Defendants is authorized by Iowa Code and is not onerous. Plaintiff's request for injunction prohibiting reimbursement for his prostheses is **denied**, and the Defendants' injunction is **granted.**

### D. Motion to Dismiss CCUSO as a Defendant

Next, the Defendants argue, and the Plaintiff agrees, that the Civil Commitment Unit for Sexual Offenders is not a person within the meaning of 42 U.S.C. § 1983. They are

34

correct.  Thus, CCUSO should be dismissed as a Defendant.  See Hafer v. Melo, 502 U.S. 21, 22-23 (1991).

**E.    Authority to Remove Prostheses and Confiscate Wheelchair**

The next issue is whether the Defendants may remove Mr. Scott's prosthetic legs and/or confiscate his wheelchair.  It seems clear from the evidence that two distinct situations have arisen where CCUSO has confiscated Mr. Scott's prosthesis or wheelchair.  First, CCUSO has confiscated Mr. Scott's prostheses and wheelchair in situations where the medical staff, including Defendant Benson, have determined that to confiscate the prostheses was medically necessary.[14]  To the extent this issue is related to medical issues, the same rational applied in subsection (A), p. 11, above applies.  For medical reasons, CCUSO may only restrict Mr. Scott's use of his prostheses or wheelchair to prevent the spread of a communicable infection, as described in section (A), p. 11 above.

---

[14]    Specifically, Mr. Scott is prone to developing sores in the area where his prostheses attaches to his biological hip.  Removing the prosthesis is medically necessary to allow the sores to heal.  Presumably the same is true regarding contact sores developed after using the wheelchair.

Second, there have been incidents in the past where Mr. Scott has used both his prostheses and wheelchair as weapons. Mr. Scott has used the wheelchair and prostheses to either intimidate other patients and the CCUSO staff, or to damage CCUSO facilities. The Defendants request an injunction allowing them to confiscate Mr. Scott's prostheses in the event he uses them to harm or intimidate. Such confiscation would be limited to a reasonable time period.

Applying the four factor test described above, it seems clear that CCUSO will likely win on the merits. As numerous Courts have stated, "a prison official violates the Eighth Amendment if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates." Newman v. Holmes, 122 F.3d 650, 652 (8th Cir. 1997). Accordingly, CCUSO would be negligent to allow Mr. Scott access to items he uses as weapons against other patients. Additionally, the Defendants have a duty to protect CCUSO staff members from unreasonable harm, and have a duty to protect CCUSO facilities. Turning to the remaining three factors, there is no public interest in this situation. While there is a risk of inconvenience to Mr. Scott if his prostheses or wheelchair are confiscated, there is no risk of

permanent harm. When the risk is weighed against the potential damage Mr. Scott could cause if CCUSO is not allowed to confiscate items he could use as weapons, it is clear that the injunction should be granted. In the event Mr. Scott uses, or attempts to use, his wheelchair or prostheses as weapons against CCUSO staff, other patients, or the facility itself, the Defendants may confiscate those items for a limited time period, up to ten days.

**F.  Authority to Remove the Court's Number from Mr. Scott's Approved Number List**

On numerous occasions, most recently on Tuesday, October 15, 2013, and Wednesday, October 16, 2013, Mr. Scott called the Court's chambers to discuss his medical issues. During these calls, Mr. Scott has attempted to argue the merits of his cases with the Court's staff. The Defendants request an injunction allowing them to remove the Court's number from the list of numbers Mr. Scott is allowed to call.

As discussed extensively above, the Court must consider the four <u>Dataphase</u> factors in deciding whether to grant an injunction. Again, those four factors are:  (a) threat of irreparable harm to the movant; (b) the state of the balance between this harm and the injury that granting the injunction

will inflict on other parties; (c) the probability that the movant will succeed on the merits; and (d) the public interest. As stated above, factor (c) is the most important.

Parties are clearly prohibited from contacting the Court ex parte to discuss the merits of a pending case. Moreover, Canon 3 of the Code of Conduct for United States Judges states:

> A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond...

Code of Conduct for United States Judges, Canon 3, Subsection 4. To combat these clear issues, the Court has promptly notified the parties of Mr. Scott's ex parte communications after they have occurred.

Additionally, neither party has provided the Court any rule, regulation, or law that states Mr. Scott, being a CCUSO patient, has a right to call to the Court's chambers. Mr.

Scott is represented by Mr. Parry, who has diligently prosecuted Mr. Scott's cases currently before this Court. Mr. Parry is capable of initiating communication with this Court and the Defendants if there is matter that needs the Court's attention. If Mr. Scott feels the need to contact the Court and chooses not to utilize Mr. Parry, Mr. Scott is also free to commit his communication to writing (as he has done numerous times in the past) and mail or fax the Court. If the Court receives a written communication from Mr. Scott, it is easy to duplicate that communication and provide it to all parties, avoiding the issues that result from unauthorized ex parte communications. However, the Court is persuaded that because there is a great risk of harm if Mr. Scott is unable to call the Court in an emergency situation, the Court will not grant the Defendants' request for a permanent injunction.[15] Thus, the Defendants' request for an injunction allowing them to remove the Court's number from Mr. Scott's list is **denied**.

### G. **Mr. Scott's Emergency Motion of October 15, 2013**

As noted above, over the weekend of October 12, 2013, Mr. Scott left the Court two (extremely emotional) voice messages.

---

[15]    However, the Court requests that Mr. Scott treat the Court staff with respect during these communications.

Mr. Scott stated that he was in pain from a liaison on his hip. Further, he stated that Nurse Benson would not treat him and he believed he needed to go the University of Iowa Hospital. Mr. Scott stated that he had been unable to reach Mr. Parry and would like an "emergency court order." The Court sent an email to the parties regarding Mr. Scott's messages on Monday, October 14, 2013. See Docket No. 31, Ex. 1. On October 15, 2013, Mr. Parry filed a Motion for Hearing, stating that:

> The plaintiff has continued to have medical problems with an open ulcer on his hip since the court hearing held at CCUSO... He has been informed by the University of Iowa Hospitals and Clinics that he needs surgery to address this ulcer. However, surgery cannot be performed until after his potassium levels have decreased. The plaintiff has been prescribed an oral medication to treat the high potassium but the oral medication causes him to urinate multiple times an hour. The plaintiff has previously received intravenous medication to treat the potassium level which does not cause the frequent urination, and requests that he be prescribed the intravenous medication so that he can receive surgery.

Docket No. 32, p1-2. On that same day, the Defendants filed a supplemental response explaining that Mr. Scott was refusing to follow the University of Iowa's proscribed method for

reducing his potassium levels and that Mr. Scott was generally being uncooperative with medical staff.  Docket No. 31.

On October 16, 2013, the Court conducted a hearing pursuant to the Plaintiff's request for a hearing.  At that hearing, both Mr. Parry and Ms. Kraemer questioned Mr. Scott regarding his medical status.  In extremely emotional terms, Mr. Scott stated that he was in pain from the sore on his leg and that the potassium medication had caused him to have issues with urination.  Mr. Scott stated that in the past, he has been admitted to the hospital to have his potassium levels lowered.  He noted that in the hospital, he is able to have intravenous medication and can have a catheter inserted to alleviate issues with urination.  Mr. Scott also complained about the manner in which Defendant Benson has dressed his wound.

On cross-examination, Mr. Scott admitted that he had discontinued use of the potassium medication and had refused to let Defendant Benson care for his wound for several days. Mr. Scott stated that he was offended that Defendant Benson referred to him as a 'liar' and that was the reason he refused to let her treat his hip.  Mr. Scott also acknowledged,

tepidly, that refusing medication and treatment was counter-therapeutic.

After Mr. Scott's testimony, the parties, along with this Court, agreed that Mr. Scott should be evaluated at the local Cherokee Hospital by a neutral doctor. The Court also granted the Defendants' oral motion for an order allowing the exchange of Mr. Scott's medical records between care providers. See Docket No. 34. The Court understands that after going to the Cherokee Hospital, Mr. Scott was transported to the University of Iowa Hospital. Because that was the outcome requested by Mr. Scott, no further action by the Court is necessary.

**H. Possible Case Resolutions**

The final issue the Court will consider is the parties' request that the Court provide guidance on how this case should proceed going forward. As stated in the Defendants' brief, Docket No. 20, p. 12-13, "Defendants ask this Court... to set forth any procedural guidance the Court would like the parties to use in resolving future disputes." Both parties made similar requests of the Court during the hearing held at CCUSO on September 5, 2013.

There is no doubt this is a complicated set of issues. As discussed extensively above, both sides have legitimate

points regarding Mr. Scott's medical care. Mr. Scott has a constitutional right to refuse treatment, while CCUSO has a legitimate interest in making sure that Mr. Scott receives medical care. Just how those conflicting rights would play out in trial (or before a higher Court) is impossible to say. One thing seems clear, however, which is that it is unlikely that all the parties would by happy with the ultimate disposition of this case.

That said, the parties have entered into, what amounts to, a defacto arrangement on how to treat Mr. Scott as this case has progressed. Currently, Mr. Scott is free to make routine medical choices. However, if either party feels that a serious medical situation is occurring, they have petitioned the Court for the Court's guidance. Under this arrangement, the Court has twice directed CCUSO to treat Mr. Scott, and most recently, encouraged CCUSO to take Mr. Scott for a neutral evaluation at the Cherokee Hospital. This situation is not ideal. However, given this cases' history, it seems to be the only workable solution. It is not workable to give Mr. Scott a blanket injunction saying he has absolute authority to make all medical decisions. He is a patient legally committed to a state facility. However, it seems equally improper (and

likely unconstitutional) to issue an injunction saying that CCUSO has complete autonomy to make medical decisions for Mr. Scott.

This Order has set out some limitations on the parties and granted some of the injunctions on a temporary basis. Other injunctions have been denied because they are unlikely to ever succeed on the merits. The Court cannot order the parties to settle a case; however, if the parties were to settle the case, there are some provisions that might be appropriate in such a settlement agreement.

If the parties were to agree, the following points seem reasonable:

1. Accept the above described injunctions as permanent.

2. Agree to drop further pursuit of these issues.

3. Agree that going forward, Mr. Scott may make routine medical decisions within the limitations set out above.

4. Agree that the Defendants will make all reasonable efforts to accommodate Mr. Scott's medical situation.

5. Agree that if a medical emergency arises related to Mr. Scott, and he refuses treatment, the Defendants can petition this Court, under this case caption, per the terms outlined in a potential settlement agreement, for an order

allowing them to treat Mr. Scott. The parties can agree that the Court's Order regarding medical treatment will be final.[16] In no circumstance will the Court grant such an order without giving both parties an opportunity to be heard.[17]

6. Agree that if a medical emergency arises, and Mr. Scott feels he is NOT receiving the treatment he needs from CCUSO, Mr. Scott and his attorney can petition the Court for an Order directing CCUSO to provide Mr. Scott proper treatment. The parties can agree that the Court's Order regarding medical treatment will be final.[18] In no circumstance will the Court grant such an order without giving both parties an opportunity to be heard.

---

[16] Such an agreement would need language allowing either this Court or the Federal Magistrate Judge in Sioux City (currently Judge Strand) to make the decisions regarding medical orders. This Court may not always be available, and limiting this issue to one judge may result in dangerous time delays.

[17] At no point and in no situation will the Court enter an order which disturbs Mr. Scott's Living Will. See Docket No. 20, Ex. F.

[18] Under the terms of Mr. Parry's appointment contract, he may petition the Court for additional fees in unusual or complicated cases. If an agreement is entered and this case is closed, Mr. Parry would be entitled to his ordinary contract fee. Under this hypothetical agreement, Mr. Parry would be allowed to petition the Court for additional fees, under the "unusual or complicated" subsection of his contract, for any work he does on Mr. Scott's behalf after a settlement agreement is reached.

7. Agree that during any hearing held pursuant to points 5 and 6, the Court can receive all evidence and testimony the Court is persuaded is appropriate.

8. Agree to any other issues the parties consider necessary.

As the Court stated above, the Court is not ordering the parties to settle the case. Those points merely seem reasonable based on the statements counsel made during the September 5, 2013, hearing. The Court's authority to continue to hear emergency medical motions is unclear, at best, in the context of a normal 42 U.S.C. § 1983 action. A settlement agreement would provide the Court both clear authority and rules to conduct these hearings going forward and would provide both parties an avenue to petition the Court going forward regardless of future developments.

## VI. CONCLUSION

For the reasons set out above, the Court denies Mr. Scott's injunction seeking to enjoin the Defendants from providing him medical care against his will. The Court also denies the Defendants' request for an injunction to transport, treat, and medicate Mr. Scott against his will, except in those limited situations related to communicable diseases,

such as MRSA infection, discussed in section V(A), p. 11 above. (The Court anticipates that by denying both requests, the status quo will be maintained.).

The Court grants the Defendants' request that Mr. Scott's injunction claim related to his diet be denied on res judicata grounds. Accordingly, the Court denies Mr. Scott's injunction seeking to control his own diet. The Defendants may continue to give Mr. Scott a medically restricted diet. The Court grants the Defendants an injunction allowing them to remove Mr. Scott's prostheses and electronic wheelchair for security/safety reasons, but denies the Defendants' request for an injunction to remove the prostheses and wheelchair for medical reasons. See section (E), p. 35, discussing when removal is appropriate. The Court grants the Defendants' injunction allowing them to continue to charge Mr. Scott a limited fee to recoup the cost of his medical devices, and denies Mr. Scott's injunction request related to the same issue. The Court denies the Defendants' injunction request to remove the Court's number from the list of approved telephone numbers. The Court grants the Defendants' Motion to Dismiss CCUSO as a defendant in this case. Finally, the Court provides procedural guidance in section (H) above.

**IT IS SO ORDERED** this 11th day of December, 2013.

_Donald E. O'Brien_
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa