# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

DANIEL J. SCOTT,

        Plaintiff,

vs.

MARY BENSON and JASON SMITH,

        Defendants.

No. C13-4028-MWB

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I.    **INTRODUCTION**.................................................................... 2
    A.   *Procedural History* ......................................................... 2
    B.   *Factual Findings* ............................................................ 11

II.   **LEGAL ANALYSIS** ........................................................ 13
    A.   *Issues* ........................................................................... 13
    B.   *Summary Judgment Standard* ...................................... 13
    C.   *Right to Refuse Treatment* ........................................... 15
    D.   *Deliberate Indifference Regarding Scott's Wheelchair And Prosthetic Legs* ........................................................... 26
    E.   *Choice of Medical Providers* ....................................... 30
    F.   *Medically Restrictive Diet* ........................................... 32
    G.   *Qualified Immunity* ..................................................... 32
    H.   *Other Issues* ................................................................ 34

III.   **CONCLUSION** ............................................................... 35

# I.    INTRODUCTION

Currently before me is a motion for summary judgment, filed by the defendants, requesting that I dismiss Scott's 42 U.S.C. § 1983 lawsuit.[1] (docket no. 59). Scott is a patient at the Civil Commitment Unit for Sexual Offenders (CCUSO), located in Cherokee, Iowa. The patients at CCUSO "have served their prison terms but in a separate civil trial have been found likely to commit further violent sexual offenses."[2]

## A.    Procedural History

This case has an extraordinarily long and complex history. An Iowa jury found that Scott has a mental abnormality associated with being a sexually violent predator. *In re Det. of Scott*, 742 N.W.2d 605 (Table) (Iowa Ct. App. 2007). Since his commitment to CCUSO, Scott has filed several suits that were assigned Judge O'Brien.

On August 5, 2011, Judge O'Brien conducted an initial review of a complaint filed by Scott in case C11–4055–DEO. Judge O'Brien appointed Scott an attorney and let his claim proceed on the following claims:

> (1) he is improperly required to follow certain dietary restrictions due to illness; (2) his electric wheelchair was improperly taken from him as a form of punishment; (3) his mail is being opened to confiscate contraband; (4) CCUSO has provided him insufficient handicap facilities; and (5)

---

[1] This case was originally assigned to Senior Judge Donald O'Brien. After Judge O'Brien passed away, the case was reassigned to me.

[2] Iowa Department of Human Services, Civil Commitment Unit for Sexual Offenders, http://dhs.iowa.gov/mhds/mental/in-patient/ccuso, last visited December 10, 2015.

> CCUSO has insufficient measures to prevent the spread of infectious disease, specifically, Methicillin-resistant Staphylococcus Aureus, MRSA.

C11-4055-DEO, docket no. 10. Both the plaintiff and the defendants filed a number of preliminary motions in that case. On September 28, 2012, Judge O'Brien entered an order granting in part and denying in part the Defendants' Motion for Summary Judgment and Motion to Dismiss. (C11-4055-DEO, docket no. 48). Judge O'Brien dismissed certain defendant(s) but denied the defendants' motion for summary judgment and allowed the case to proceed against Mary Benson. Defendant Benson appealed and the Eighth Circuit Court of Appeals reversed Judge O'Brien, stating he had used the wrong legal standard. Specifically, the Eighth Circuit Court of Appeals stated:

> Both parties argued to the district court that the deliberate indifference standard from the Eighth Amendment should govern Scott's Fourteenth Amendment claim. Relying on a non-binding case, *McDonald v. Eilers*, Civ. No. 88-2751, 1988 WL 131360, at *2 (E.D. Pa. Dec. 7, 1988), the district court instead analyzed Scott's claim under the professional judgment standard from *Youngberg v. Romeo*, 457 U.S. 307 (1982).

*Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014). The court went on to say:

> [W]here a patient's Fourteenth Amendment claim is for constitutionally deficient medical care, we apply the deliberate indifference standard from the Eighth Amendment. *Senty-Haugen v. Goodno*, 462 F.3d 876, 889-90 (8th Cir. 2006). Accordingly, the district court should have applied the deliberate indifference standard to Scott's claim.

*Scott*, 742 F.3d at 339.

Based on this ruling, Judge O'Brien ordered additional briefing. On May 12, 2014, Judge O'Brien again denied the motion for summary judgment, this time applying the deliberate indifference standard. (C11-4055-DEO, docket no. 87.) The case is

3

currently scheduled for trial on Wednesday, January 20, 2016, to be held concurrently with the above captioned case.

While the "main issue" in case C11-4055-DEO was progressing through the court, the parties filed a number of ancillary motions. On February 3, 2012, the defendants' attorney, Gretchen Kraemer, filed an emergency motion. (C11-4055-DEO, docket no. 16). Ms. Kraemer stated that Scott's potassium was dangerously low because of his diabetes. Ms. Kraemer requested authority to transport and treat Scott even though he was refusing treatment. *Id*. Judge O'Brien granted the defendants' emergency motion on the same day. (C11-4055-DEO, docket no. 17).

On March 14, 2013, Ms. Kraemer filed another emergency motion stating that Scott was refusing treatment for an infection. Ms. Kraemer requested that Judge O'Brien allow the defendants to treat Scott against his will. (C11-4055-DEO, docket no. 58). On March 15, 2013, Judge O'Brien conducted a hearing regarding the defendants' emergency motion. During that hearing, Judge O'Brien advised the parties of a letter written to Judge O'Brien by Scott, in which Scott argued that forced medication is a violation of his constitutional rights. Judge O'Brien entered an order (C11-4055-DEO, docket no. 64), authorizing the defendants to transport Scott to a hospital and treat his infection. Judge O'Brien also directed that Scott's letter be filed as a new lawsuit, which became the above captioned case C13-4028-MWB. (docket nos. 1 and 7).

On April 3, 2013, Judge O'Brien entered an initial review order in this case. (docket no. 6). Judge O'Brien directed Scott's appointed counsel, Pat Parry, to file an amended complaint. In that amended complaint, Scott set out nine claims, but three of those were duplicates. (docket no. 11). First, Scott claimed he was being forced to have unwanted medical treatment, even though he had signed liability releases and a do not resuscitate form. Second, Scott claimed he was forced to endure improper dietary restrictions. Third, Scott alleged retaliation in the form of restricted privileges. Fourth,

Scott alleged (a seeming deliberate indifference claim) related to needing to use an electric wheelchair and having to pay for some medical services. Fifth, Scott alleged (a seeming deliberate indifference claim) related to needing prosthetic legs and being forced to pay for them. Finally, Scott alleged (a seeming deliberate indifference claim) related to needing medical services beyond what CCUSO officials were able to provide and wanting to see independent specialists. Scott requested both damages and injunctive relief. The defendants then filed a counterclaim, also requesting injunctive relief, specifically requesting the ability to treat Scott against his will if the defendants found it medically necessary.

On September 5, 2013, Judge O'Brien traveled to the CCUSO unit in Cherokee, Iowa, and conducted a hearing on the motions for injunctive relief contained in the amended complaint and counterclaim. (docket nos. 11 and 12). On December 11, 2013, Judge O'Brien entered an order which granted some of the motions, and denied others. (docket no. 38). Regarding the main issue, Judge O'Brien denied both parties' request for a temporary injunction. (docket no. 38, p. 19-23). Judge O'Brien found that there is a constitutional right to refuse treatment, and he could not grant the defendants a temporary injunction that would violate that right.[3] However, he also noted that some courts have found the right to refuse treatment diminished for those who are incarcerated. Accordingly, Judge O'Brien could not say with certainty that Scott could succeed on the merits of his case. Since success on the merits is an important factor in determining if injunctive relief is appropriate, Judge O'Brien denied Scott's request for a preliminary

---

[3] Judge O'Brien did grant the defendants a limited temporary injunction that would allow CCUSO officials to treat Scott if he developed a highly communicable disease which would imperil other CCUSO patients.

injunction.[4]  Judge O'Brien's stated intended result of his ruling was that he would preserve the arrangement whereby Scott could refuse most medical services.  (docket no. 38, p. 22-23).  As anticipated by Judge O'Brien, under the arrangement, Scott would be able to refuse routine medical treatment, but the defendants could file an emergency motion if a life threatening situation developed.

Regarding Scott's diet, as will be discussed in more detail below, Judge O'Brien unambiguously ruled that Scott's claim was barred and dismissed it.  (docket no. 38, p. 30).  Regarding Scott's claim related to his prosthetic legs and his electric wheelchair, Judge O'Brien ruled that the defendants had statutory authority to recoup some costs of the medical devices they purchased on Scott's behalf and that the defendants were within their rights to confiscate Scott's medical devices when he used them as weapons. Accordingly, Judge O'Brien denied Scott's claims related to those issues.[5]  (docket no. 38, p. 34, 36-37).  After deciding a number of other issues Scott had brought up during the hearing, Judge O'Brien advised the parties that a settlement was likely the best

---

[4] A request for a preliminary injunction is analyzed under the four factors set forth by the Eighth Circuit Court of Appeals in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981).  Those factors are "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Id*. at 114.  Of these factors, success on the merits has been referred to as the most important factor.  *Roudachevski v. All–American Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011).

[5] Insofar as the defendants wanted to confiscate Scott's medical devices because they thought using the devices would be medically unwise, Judge O'Brien noted his earlier ruling that Scott could make routine medical decisions, and that included whether or not he used his medical devices.

outcome for Scott's case considering the case's unusual history.[6]  Finally, Judge O'Brien denied the defendants' request that they be allowed to prohibit Scott from calling the courthouse.

Thereafter, the defendants filed the present motion for summary judgment. (docket no. 59).  Judge O'Brien held a hearing on May 8, 2015.  On June 4, 2015, Scott filed a motion to continue trial and stay ruling on the motion for summary judgment. Scott's attorney, Mr. Parry, informed Judge O'Brien that a new witness had recently been discovered.  Judge O'Brien granted the motion, over the defendants' objections, and reopened discovery for an additional sixty days.  (docket no. 73.)  However, no additional supplements were filed during that sixty day period and the motion for summary judgment is now fully submitted.

As Scott's two cases have progressed, Judge O'Brien addressed a number of other issues related to Scott.  During the weekend of October 12, 2013, Judge O'Brien received two phone calls from Scott complaining about a lesion on his hip and CCUSO's (alleged) failure to treat it.  On Monday, October 14, 2013, Judge O'Brien advised the parties of these *ex-parte* communications.  (docket no. 31-1).  In response, the defendants filed a supplement on October 15, 2013.  (docket no. 31).  On that same date, the plaintiff filed a request for an emergency hearing.  (docket no. 32).  Judge O'Brien conducted a telephonic hearing on October 16, 2013.  Following that hearing, Judge O'Brien instructed that Scott should be evaluated at the Cherokee Hospital.  (docket no. 38).

On February 10, 2014, Scott contacted Judge O'Brien to say he did not have access to bathroom facilities.  Judge O'Brien contacted counsel and was advised that a handicapped bathroom at CCUSO had briefly been locked due to an issue with a different

---

[6] Judge O'Brien also ordered the parties to participate in a settlement conference before Judge Strand.  (See docket no. 77.)  However, the case did not settle.  (docket no. 79).

CCUSO patient but, following that incident, the handicapped bathroom had been reopened. Judge O'Brien determined that no additional action was needed at that time.

On March 20, 2014, Scott's counsel, Mr. Parry, informed Judge O'Brien via email that Scott would like a hearing regarding the number of electrical outlets (plug-ins) in his room. The defendants objected to a hearing on that matter and informed Judge O'Brien that Scott already had six outlets in his room. Judge O'Brien denied Scott's request for a hearing, stating:

> The Court is persuaded that the Defendants are correct. By his own admission, Scott has six outlets. This is not an issue upon which relief can be granted. Accordingly, the Plaintiff's request for a hearing is denied.

(docket no. 42, p. 2).

On April 15, 2014, Scott contacted Judge O'Brien requesting an emergency hearing because he did not have access to an adequate shower chair. Judge O'Brien contacted counsel and was advised that a new chair had been ordered for Scott. Based on that information, Judge O'Brien determined that no additional action was needed at that time.

On October 28, 2014, Judge O'Brien received an email from Mr. Parry stating that Scott had a severe infection. Judge O'Brien contacted CCUSO's counsel, Ms. Kraemer, who stated that Scott was scheduled for evaluation treatment at the University of Iowa. After further consultation with the parties, Judge O'Brien determined that no additional action was needed.

On January 5, 2015, Scott filed a request for a hearing regarding taking his own oxygen levels and using a different oxygen machine. (docket no. 48). Judge O'Brien held a hearing. Following the hearing, Judge O'Brien entered an order stating that Scott should use the oxygen machine he was already using and could monitor his oxygen in the manner discussed during the hearing. Judge O'Brien also stated:

As mentioned above, in the court's previous order in this case, the court directed the parties to file emergency motions if a life threatening issue arose in relation to Scott. *See* Docket No. 38. However, absent a life threatening issue, the court has little authority to consider novel issues in the above captioned case absent additional filings. Additionally, it is unfair to the appointed attorney to add issues to a progressing case without following the proper procedures for opening a new case. It is also unfair to other CCUSO patients who go through the steps of filing new lawsuits when new issues arise. Accordingly, the court reminds the parties that they may file an emergency motion under the above captioned case if there are life threatening issues as set out in the Order on the Motion to Dismiss, Docket No. 38, filed December 11, 2013. However, if Scott wants to pursue new, unrelated legal actions, he needs to file new cases in the same manner as other CCUSO patients.

(docket no. 56, p. 16-17).

On March 27, 2015, Judge O'Brien received a call from Scott saying that CCUSO confiscated food from his room while he was in the hospital. Scott demanded an immediate hearing with the court. Judge O'Brien denied Scott's request for a hearing and noted that, on several different occasions already, he had denied Scott's legal claims regarding Scott's diet. (docket no. 63). Specifically, Judge O'Brien stated:

As noted by Ms. Kraemer, this Court has already considered issues related to Mr. Scott's diet. As set out in this Court's previous Order: "Issues related to Mr. Scott's diet were previously discussed in the case of 11-CV-4055-DEO, in 2012. The parties agree the parties are the same and that the issues are the same. (*See* Docket No. 24, p. 3, stating '[t]he Plaintiff admits that he previously sued for a preliminary injunction on the diet issue last year which were denied by Magistrate Judge Zoss and accepted by the District Court.')." Docket No. 38, p. 25. . . [I]n the above captioned case, the

Court denied Mr. Scott's ability to again bring food claims, saying: "[t]here is no allegation that Mr. Scott's claim for a temporary injunction regarding his diet could not have been fully and fairly litigated in the earlier case. Accordingly, all three factors for claim preclusion have been met: the prior case had the same parties, had the same issue, and Mr. Scott had an opportunity to litigate his claim… the mere fact that Mr. Scott is now healthier because he has followed the medically restricted diet does not alter the fact that this issue was fully and fairly litigated in the previous case. Accordingly, the principle of claim preclusion applies and Mr. Scott's request for a temporary injunction related to his diet is barred." Docket No. 38, p. 26-27. The Court also noted that there is no constitutional right to choose your own menu while civilly committed. This Court stated: "[i]t is undisputed in the record that CCUSO has designed a diet plan for Mr. Scott based on medical recommendations. As the foregoing analysis from the Defendants' brief makes clear, there is no right or requirement that would force CCUSO to provide Mr. Scott the meals of his choice. Providing Mr. Scott with food is different from forcing medical care on Mr. Scott. CCUSO has a responsibility to provide Mr. Scott food that is nutritionally sufficient. CCUSO is doing that, even if Mr. Scott would rather have better tasting, but less healthy food. Even if CCUSO had to absolutely and completely abide by Mr. Scott's choices regarding his medical treatment, that would not confer upon CCUSO an affirmative obligation to provide Mr. Scott food they know would be unhealthy for him. Accordingly, applying the *Dataphase* factors set out above, it is clear that Mr. Scott has virtually no chance of success on the merits of this matter. Moreover, there is no risk of irreparable harm from continuing to allow CCUSO to provide Mr. Scott a medically restricted diet. There is no public interest in this issue. On balance, CCUSO is correct that by allowing Mr. Scott to eat whatever he likes, regardless of medical advice, they could be opening themselves up for

liability under the deliberate indifference standard. Accordingly, the balance tips in favor of denying Mr. Scott's request for injunctive relief." Docket No. 38, p. 29-30. Thus, it is clear that this Court has already decided that CCUSO has the authority (and perhaps an obligation) to make decisions regarding Mr. Scott's diet. That authority includes prohibiting Mr. Scott from eating certain foods that are deemed to be contraband. Accordingly, to the extent Mr. Scott objects to restrictions placed on his diet, including CCUSO Defendants confiscating contraband food, his claims are barred by the doctrine of *res judicata*.

(docket no. 63, p. 11-15).

## B.    *Factual Findings*

As opposed to many cases, this case has a long record and contains numerous facts. However, few of those facts are seriously disputed. Judge O'Brien held two separate evidentiary hearings (one regarding the preliminary injunctions and one regarding the present motion for summary judgment), and the parties have filed many, if not most, of Scott's medical and disciplinary records with the court.[7] Unless otherwise noted, the following facts are undisputed.

The remaining defendants in this case are Mary Benson, a nurse practitioner and the primary medical provider, and Jason Smith, the former head of the CCUSO unit.

As set out above, the plaintiff, Scott, is a long time patient at CCUSO. Scott has significant medical issues and those medical issues, in one way or another, underlie all

---

[7] At the motion for summary judgment hearing before Judge O'Brien, the parties agreed it was appropriate to consider all the evidence concurrently contained in the record.

his claims. Scott is diabetic, has a history of MRSA type infections, suffered a severe heart attack, and has had his legs amputated.[8] As a result of his poor health, Scott's mobility is severely restricted. He has had issues with his potassium levels and diabetic spells. Because of his diabetes and history of MRSA, Scott is prone to getting sores and there is always a danger the sores may become infected. He either uses a wheelchair or prosthetic legs to get around. However, on at least one occasion, Scott was disciplined for using his wheelchair as a battering ram. On another occasion, the defendants disciplined Scott for not taking care of his prosthetics (which are, initially, paid for by CCUSO). Scott also complains about the quality of his current prosthetics and about what wheelchair he has. (He has had an electric wheelchair, but at times has been forced to use a manual wheelchair.) It is undisputed that Scott has received new prosthetic legs since the filing of this suit. The defendants also provide Scott a medically restricted diet, designed to be compatible with his diabetes. Similarly, the defendants also restrict Scott's access to certain "junk" type food, such as candy.

By Scott's own admission, he can be a "difficult" patient. He sometimes changes his mind about what type of treatment he wants. In fact, in a fit of anger, Scott has even refused treatment from his preferred provider, the University of Iowa Hospital. It is also fairly undisputed that Scott and nurse Benson have a difficult relationship. For the most part, Scott now refuses to let Benson treat his minor health issues, as he checks his own diabetes and monitors his own sores. However, as set out in the procedural history

---

[8] The extent of Scott's medical condition, and the circumstances surrounding his heart attack and leg amputation, give rise to Scott's companion deliberate indifference case, C11-4055-MWB. Judge O'Brien denied the defendants' motion for summary judgment in that case, and it will proceed to trial on January 20, 2016. Accordingly, there is no need to rehash all the circumstances/allegations surrounding that incident in this order.

above, there have been several occasions since this case began where Scott has had significant health scares that required intense hospitalization.

Other facts will be discussed below.

## II.    LEGAL ANALYSIS

### A.    Issues

Based on the forgoing, there are four issues from Scott's amended complaint remaining.    First, Scott's right to refuse treatment.    Second, issues related to Scott's wheelchair/prosthetic legs.    Third, issues related to Scott's diet.    Fourth, issues related to where Scott should receive medical treatment.    I must also consider the other arguments contained in the defendants' motion for summary judgment, including qualified immunity, personal responsibility, and immunity from money damages.

### B.    Summary Judgment Standard

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] … which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*) (quoting *Celotex*, 477 U.S. at

323, 106 S. Ct. 2548). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

When the parties have met their burden, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, [557 U.S. 557], 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).... "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042–43. Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

## C.     Right to Refuse Treatment

The first issue I will consider is the most complicated. Scott argues that he should be allowed to refuse medical treatment.[9] Judge O'Brien previously set out the state of the law regarding the right to refuse medical treatment, and the parties do not seriously object to his findings. As Judge O'Brien noted in his previous order, many individual states have recognized a right to refuse medical treatment.[10] For example, the Massachusetts Supreme Court stated, "[t]here is implicit recognition in the law … that a person has a strong interest in being free from nonconsensual invasion of his bodily integrity." *Superintendent of Belchertown State Sch. v. Saikewicz*, 370 N.E.2d 417, 424 (Mass. 1977).[11] That court went on to say:

> Of even broader import, but arising from the same regard for human dignity and self-determination, is the unwritten constitutional right of privacy found in the penumbra of specific guaranties of the Bill of Rights. As this constitutional guaranty reaches out to protect the freedom of a woman to terminate pregnancy under certain conditions, so it encompasses the right of a patient to preserve his or her right to privacy against unwanted infringements of bodily integrity in appropriate circumstances.

*Superintendent of Belchertown State Sch.*, 370 N.E.2d at 424 (internal citations omitted).

---

[9] In this section, I consider only Scott's general right to refuse medical treatment. Specific issues, such as his desire to refuse a medically restricted diet and his wheelchair/prosthetic legs, will be considered in subsequent sections.

[10] The right to refuse medical treatment is commonly codified. *See* for example Minn. Stat. Ann. § 144.651, Subdivision 12, stating that, "[c]ompetent patients and residents shall have the right to refuse treatment.…"

[11] *See also Scholoendorff v. Society of New York Hopsital*, 105 N.E. 92 (N.Y. 1914); *Steele v. Hamilton Cty. Cmty. Mental Health Bd.*, 736 N.E.2d 10; *In re Brooks' Estate*, 205 N.E.2d 435 (Ill. 1965).

Subsequently, the Supreme Court took up the issue of a constitutional right to refuse medical treatment and stated that:

> Just this Term, in the course of holding that a State's procedures for administering antipsychotic medication to prisoners were sufficient to satisfy due process concerns, we recognized that prisoners possess 'a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment.'. . . Still other cases support the recognition of a general liberty interest in refusing medical treatment... for purposes of this case, we assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition."

*Cruzan by Cruzan v. Dir., Missouri Dept. of Health*, 497 U.S. 261, 278-79 (1990) (internal citations omitted).  The dissent in that case argued that a person's right to refuse medical treatment was not just suggested by the due process clause, but is guaranteed by the constitutional right to privacy.  *Id*. at 302 (Brennan, J. dissenting).[12]  The Supreme Court subsequently affirmed the (suggested) right to refuse treatment, stating, "We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

---

[12] Justice Brennan stated, "Today the Court, while tentatively accepting that there is some degree of constitutionally protected liberty interest in avoiding unwanted medical treatment, including life-sustaining medical treatment such as artificial nutrition and hydration, affirms the decision of the Missouri Supreme Court. . .  Because I believe that Nancy Cruzan has a fundamental right to be free of unwanted artificial nutrition and hydration, which right is not outweighed by any interests of the State. . .  I respectfully dissent."  *Cruzan*, 497 U.S. at 302 (Brennan, J. dissenting).

Additionally, the Supreme Court has repeatedly taken up the issue of whether, and to what extent, the government can force a detainee to take antipsychotic medication. In those cases, the court has concluded:

> [T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

*Sell v. United States*, 539 U.S. 166, 179 (2003).[13]

Based upon those opinions, it is clear that Judge O'Brien correctly found that individuals have a general right to refuse treatment. The question becomes, does CCUSO have a countervailing interest that overcomes Scott's right?

As the *Sell* Court stated, all jurisdictions provide a civil means to force medication on certain individuals. Judge O'Brien explained that the civil process in Iowa requires a showing that the patient is dangerous and that the person cannot make responsible decisions on the matter. In Iowa, two code chapters discuss the State's process for overriding a patient's liberty interest in refusing treatment. IOWA CODE § 229 permits medication and treatment when the patient is determined to be seriously mentally impaired—the patient must have a mental illness, must be unable to make responsible

---

[13] In the same case, the court stated, "For another thing, courts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, *Harper*-type grounds. Every State provides avenues through which, for example, a doctor or institution can seek appointment of a guardian with the power to make a decision authorizing medication when in the best interests of a patient who lacks the mental competence to make such a decision." *Sell*, 539 U.S. at 182.

treatment decisions, and must be a danger to self or others. IOWA CODE § 229.1(17); *O'Connor v. Donaldson*, 422 U.S. 563, 576 (1975) (requiring proof of dangerousness) (establishing dangerousness criterion; need for treatment alone is not sufficient). Additionally, IOWA CODE § 125 permits the involuntary treatment of chronic substance abusers. When a patient is not competent to make his or her own decisions, a guardian may be appointed to make substituted decisions under IOWA CODE § 633.635. There is also a board available to make one-time medical decisions for a person who is not competent to render those decisions himself, and who has no guardian. IOWA CODE § 135.29. However, the parties agree that Scott is mentally competent and that the civil procedures are not applicable.

Unfortunately, it seems that no exactly analogous situation has been considered (and reported) by other courts. So, I must consider similar situations. The principal case that the defendants have relied upon is *Polk County Sheriff v. Iowa District Court for Polk County*, 594 N.W.2d 421 (Iowa 1999). In that case, the Iowa Supreme Court stated:

> The issue is whether competent persons, while being held as pretrial detainees, have a constitutional right to refuse unwanted medical treatment... In balancing [detainee's] diminished liberty interest to refuse treatment against the State's countervailing interests in preserving life, preventing suicide, protecting the interests of innocent third parties, maintaining the ethical integrity in the medical profession, and maintaining prison security, order, and discipline, we conclude the State's interests must prevail.

*Polk Cnty. Sheriff*, 594 N.W.2d at 431. The Iowa Supreme Court considered issues very similar to the arguments made by the defendants in this case and stated that, while the detainee would normally have a right to refuse treatment, his unique status in custody allowed the State's countervailing interest to prevail and forced medication was allowed. However, that case was decided by a slim majority and was hotly dissented from.

> The majority's application of the legal principles that are appropriate to this issue seriously diminishes, if not eliminates, to a pretrial detainee the liberty interest established by the United States Constitution. Under the majority's analysis, it would be extremely unlikely that any exercise of the liberty interest to refuse unwanted medical treatment would be upheld over a jailer's objection. This is because a jailer could always conjure up a fear that a prisoner's act of exercising his constitutional liberty interest would have a "fallout" effect on other prisoners. This possible fallout effect allegedly would then cause serious adverse consequences to the jail's security, order and discipline requirements. As viewed by the majority, that possibility is enough to tip the scales under the balancing test and necessitate a jettisoning of the liberty interest of the United States Constitution. A possibility of fallout is all that the sheriff puts forth as evidence. Beyond that, there is no foundational support in fact for the premise that prison security, order and discipline would be seriously affected adversely if [detainee] were allowed to exercise his constitutional right.

*Polk Cnty. Sheriff*, 594 N.W.2d 431-32 (Snell, J dissenting). Moreover, the case is non-binding state court precedent. The defendants also cite several other non-binding decisions. *See also Davis v. Agosto*, 89 F. App'x 523 (6th Cir. 2004) (permitting prison to suture an open wound even if the inmate disagreed, noting the prison could easily face a deliberate indifference claim for failing to treat the open wound); *Parks v. McCoy*, 35 F. App'x 239, 241 (7th Cir. 2002) (inmate forced to take tuberculosis medication against his will based on a misdiagnosis did not state a constitutional claim for relief); *People ex rel. Ill. Dep't of Corr. v. Millard*, 335 Ill. App. 3d 1066 (Ill. App. Ct. 2003) (holding Illinois DOC does not violate an inmate's constitutional rights in seeking a court order to force feed an inmate on a hunger strike); *McCormick v. Stalder*, 105 F.3d 1059, 1062 (5th Cir. 1997) (due process does not prevent prison officials from forcing a prisoner

to undergo treatment for tuberculosis); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) (rejecting constitutional challenge to decision by prison officials to force-feed a detainee to preserve his health after a hunger strike); *State ex rel. Schuetzle v. Vogel*, 537 N.W.2d 358, 364 (N.D. 1995) (future medical cost of allowing diabetic prisoner to refuse treatment justified forced injections of insulin); *Commissioner of Corr. v. Myers*, 399 N.E.2d 452, 454 (Mass. 1979) (permitting dialysis over inmate's objection); *Sconiers v. Jarvis*, 458 F. Supp. 37, 40 (D. Kan. 1978) ("[D]efendants had an affirmative constitutional duty to provide necessary medical treatment regardless of consent because intentional denial of medical treatment … constitutes cruel and unusual punishment.").

Most of those cases contain important factual and legal distinctions. The *Sconiers* case was decided well before the Supreme Court recognized the right to refuse medical treatment, as was the *Myers* case. The *Vogel* case dealt with a situation where an inmate was using his refusal for medical services as a bargaining chip to try and secure parole and a financial award. *Vogel*, 537 N.W.2d at 359. The *Vogel* court also applied, or seemed to apply, the Supreme Court's standard related to a mentally ill prisoner, even though the prisoner was mentally sound. *Id*. at 362, stating, "[o]ne could conclude from *Harper*, 494 U.S. at 227-229, 110 S. Ct. at 1040, that a competent inmate has no more right than an incompetent inmate to reject forced medication 'if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.' We find nothing in *Harper* that gives a competent prisoner an absolute right to refuse necessary medical treatment regardless of a state's penological interests.") The *Martinez* decision did not turn on constitutional questions, instead, the Eighth Circuit Court of Appeals relied on statutory authority to rule that force feeding was permissible. The Eighth Circuit Court of Appeals specifically pointed out that the plaintiff had failed to ground his claim in the Constitution, stating, "[t]he mere allegation of forced-feeding does not describe a constitutional violation." *Martinez*, 977 F.2d at 423." Both *Parks* and

*McCormick* dealt with a prisoner who had an infectious disease, and Judge O'Brien previously ruled that the defendants clearly have a legitimate and overriding interest in treating Scott if he is inflicted with an infectious disease such as whooping cough. The *Millard* decision was made based on a right to privacy framework without discussing the specific right to refuse medical treatment, a point which the dissent in that case made. "[T]he right to refuse medical treatment continues to reside with [the prisoner]. I believe this right encompasses refusing nourishment. The right to die—if he chooses to do so quietly and without disruption—is a civil liberty he retains. It is a liberty that belongs to him. If the government wishes to take that liberty from him, it must explain and persuade. It cannot just speculate that something bad may happen." *Millard*, 335 Ill. App. 3d at 1075 (Knecht, J. dissenting). Finally, in the *Davis* case, which cited many of the other cases discussed above, the Sixth Circuit Court of Appeals concluded that a prison doctor had a legitimate penological interest in closing a bleeding wound that was possibly endangering both the prisoner and others. *Davis*, 89 F. App'x at 528. However, the decision in that case was summary, and did not discuss the underlying analysis describing what penological interest the prison had.

A better case for the defendants, although in no way precedential, is *Wolfe v. Alexander*, No. 3:11-CV-0751, 2014 WL 4897733 (M.D. Tenn. 2014). In that case, which relied heavily on *Davis* and the other cases cited above, the judge stated:

> [E]ven if the [the forced medical intervention does] in fact, violate his substantive due process rights to refuse medical treatment, "that right is not absolute and is particularly susceptible to regulation in the prison setting." *Davis*, 89 F. App'x. at 528. "[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is reasonably related to legitimate penological interests. . . This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other

21

> circumstances would have been required to satisfy a more rigorous standard of review." *Harper*, 494 U.S. at 223 (internal quotation marks and citations omitted). The Supreme Court has explicitly recognized the "legitimacy, and the necessity, of considering the State's interests in prison safety and security." *Id*. at 223.

*Wolfe*, 2014 WL 4897733, at *8. The court then went on to apply the four factor *Turner* test, set out in *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed.2d 64 (1987), to determine if medical treatment was appropriate. Since the Eighth Circuit Court of Appeals also routinely applies the *Turner* test to cases questioning the propriety of prison regulations, I am persuaded that the appropriate next step in the analysis is to consider the defendants' desire to override Scott's right to refuse medical care under the *Turner* framework.

The *Turner* test asks: 1) whether there is a valid, rational connection between the regulation and legitimate governmental interests put forward to justify it; 2) whether alternative means of exercising their rights remain open to the prisoners; 3) whether accommodation of the asserted rights will trigger a "ripple effect" on fellow inmates and prison officials; and 4) whether a ready alternative to the regulation would fully accommodate the prisoners' rights at *de minimis* cost to the valid penological interest. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1039 (8th Cir. 2012) (internal citations omitted).[14]

---

[14] As discussed above, Scott is a patient, not a prisoner. Thus, the term 'penological' interest is a bit of misnomer in the context of civilly detained patients, because, as Justice Kennedy observed, "while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone." *Kansas v. Hendricks*, 521 U.S. 346, 373, 117 S. Ct. 2072, 2087, 138 L. Ed. 2d 501 (1997) (Kennedy, J., concurring). Accordingly, District Judge Donovan Frank, in Minnesota, has adapted the legitimate penological interest standard into the civil commitment context, finding that, "the Court [must

The defendants present four reasons for wanting to treat Scott (other than general humanitarian concerns.)  The defendants argue that treatment is in Scott's best interest; that Scott's refusal of initial care may ultimately result in needing more care later; later care at a more advanced stage of illness may cost more; and, finally, that the sight of Scott untreated would have an adverse effect on the morale of other CCUSO patients. There is no doubt that those reasons are legitimate governmental interests.  However, this case does not concern a specific incident.  Rather, it deals with Scott's general right to refuse medical care.  It is difficult for me to analyze the relationship between the government's reasons for treating Scott and the governmental interest based on hypotheticals.  For example, if Scott chose to forgo Nyquil, and instead suffered through a cold without treatment, there is little chance that the morale of his fellow patients would be affected.  However, if Scott refused treatment for a hand ulcer which turned necrotic, and his fellow CCUSO patients were forced to watch in horror as Scott's hand slowly rotted off, there is a more direct nexus between the defendants' desire to treat Scott and the morale of his fellow patients.

Second, there is no alternate means for Scott to exercise this right.  He is either allowed to refuse treatment, or he is not.  Third, it is hard to imagine that Scott's decision would have a "ripple effect" on other prisoners.  Scott is in very poor health.  By request of the parties, the upcoming trial in Scott's cases will be held at CCUSO, because it would be too taxing to bring Scott to the Federal Courthouse in Sioux City, Iowa.  It is unlikely that the other patients will want to imitate Scott's situation.  The final question asks whether there is a ready alternative that can accommodate both parties' interests.  I believe there is, and it lies in Judge O'Brien's previous order.

---

consider] each of Plaintiffs' [constitutional] claims in light of appropriate therapeutic interests as well as relevant safety and security concerns." *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 937 (D. Minn. 2014).

After applying the *Dataphase* factors, Judge O'Brien denied both parties' requests for injunctions, saying that it would be inappropriate to enter an order saying that either "Scott may always choose to refuse treatment," or that "Scott may never make his own medical decisions." Instead, Judge O'Brien entered a limited injunction which stated that the defendants could clearly treat Scott if he developed a highly contagious disease, because that conclusion is clearly supported by the extensive case law cited above. Judge O'Brien's prior order accurately reflected the law, which can be briefly summarized in two parts. First, Scott, like any citizen, has a general right to refuse unwanted medical care. Second, in some circumstances, the defendants may have a "penological" interest that outweighs Scott's right to refuse medical care. One factor that all of the above cited cases have in common is that they deal with a situation that was either ongoing or had already occurred. For example, a prisoner was on a hunger strike and starving and the prison wanted a declaratory judgment saying they could intervene with medical treatment, or a prisoner had an open wound and the prison officials had treated it. None of those cases asked a court to prospectively decide the course of treatment for an illness that had yet to occur. There simply is no law which would support me doing so. Accordingly, both parties' requests for injunctions regarding general medical care are denied, and those claims[15] are dismissed.[16]

---

[15] The defendants' request for injunctive relief is the sole issue in their counterclaim (docket no. 12).

[16] During the hearing on this matter, the parties discussed whether all relevant facts were currently before the court. The defendants argued that a complete factual record had already been made. Scott argued that there may be additional 'new' facts regarding Scott's diet, wheelchair/prosthetics issue, and his desire to be treated away from CCUSO. However, there was no allegation that there were additional relevant facts

By denying both claims, I, as Judge O'Brien did before, believe that the status quo will be preserved, whereby Scott, like any citizen, can generally make his own treatment decisions. But, as the case law demonstrates, the defendants can clearly treat Scott if he is suffering from a contagious or infectious illness. In other situations, such as a matter of life or death, or an issue affecting the morale of CCUSO patients, the defendants may have the right to treat Scott against his will.[17] However, that must be decided on a situational basis.[18] Finally, I note that this conclusion does not appear out of step with what the parties are requesting. As set out in the defendants' brief, "[t]his court's ruling on the preliminary injunction is fully satisfactory to defendants. Defendants are permitted to force treatment of MRSA infections or any other highly communicable disease such as whooping cough. Other issues may be raised to the court's attention if needed." (docket no. 59-2, p. 13) And, although Scott did not affirmatively agree with the defendants, neither in his brief nor during the hearing did he challenge Judge O'Brien's temporary injunction order. Rather, Scott's arguments pertained to the medical diet, the wheelchair/prosthetics issue, and where he would receive treatment.

---

unknown to the court regarding the right to refuse treatment issue. Accordingly, this matter is fully submitted for final disposition at the summary judgment stage.

[17] As set out in the procedural history above, during the pendency of this case, Judge O'Brien twice made the determination that the defendants' need to treat Scott outweighed his right to refuse and gave the defendants temporary orders allowing treatment.

[18] As is clear in the record, the parties have already attempted to mitigate the situation. The defendants have employed liability waivers when Scott has refused treatment. Scott has signed a power of attorney form and an advanced life directive. (*see* docket no. 20).

### D.   *Deliberate Indifference Regarding Scott's Wheelchair And Prosthetic Legs*

Next, I turn to the issue of Scott's wheelchair and prosthetic legs. Scott claims that the defendants have been deliberately indifferent because, at various times, he has been denied access to his preferred electric wheelchair. He also argues that he does not have satisfactory artificial/prosthetic legs.[19]

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban on cruel and unusual punishments. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To prevail on such a claim, an inmate must show "that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). Under the first requirement, an objectively serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (quoting *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991)). Under the second requirement, an official is deliberately indifferent "if he or she actually knows of the substantial risk and fails to respond reasonably to it." *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007). "Although the level of blameworthiness must rise above negligence, a plaintiff does not have to show that the prison officials acted 'for the very purpose of causing harm or with knowledge that harm w[ould] result.'" *Letterman v.*

---

[19] In Judge O'Brien's earlier ruling, he addressed IOWA CODE § 229A.12, which allows CCUSO to charge Scott for certain medical devices it purchases on his behalf. Judge O'Brien found that the defendants were within their statutory authority to charge Scott for reimbursement for certain medical devices. The parties have made no further argument on that issue, and I find no reason to disturb Judge O'Brien's prior ruling.

*Does*, 789 F.3d 856, 862 (8th Cir. 2015) (quoting *Farmer*, 511 U.S. at 835). However, a claimant's "mere disagreement with treatment decisions does not rise to the level of constitutional violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)). Courts also apply the deliberate indifference standard to civilly committed individuals. *See Senty–Haugen v. Goodno*, 462 F.3d 876, 889 (8th Cir. 2006), which applied the deliberate indifference standard to a medical-care claim raised by a patient involuntarily committed as a sexually violent predator under the Fourteenth Amendment. *See also Scott*, 742 F.3d at 339, stating, "where a patient's Fourteenth Amendment claim is for constitutionally deficient medical care, we apply the deliberate indifference standard from the Eighth Amendment. *Senty–Haugen*, 462 F.3d at 889–90."

With regard to the first element of a deliberate indifference claim, I will assume that Scott's need for prosthetics and a wheelchair are sufficiently serious—as Scott has no legs. The second deliberate indifference element is subjective and requires that Scott present evidence which supports a finding that the defendants "acted with a sufficiently culpable state of mind, namely, that they actually knew of, but deliberately disregarded [his] medical needs." *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (internal citations and quotation marks omitted).

First, Scott claimed deliberate indifference because the defendants confiscated the wheelchair and the prosthetics. Judge O'Brien fully addressed this issue in his prior order, finding the defendants clearly were within their authority to confiscate Scott's implements when he was using them, or attempting to use them, as weapons. Judge O'Brien was correct, and I find no reason to disturb that part of his prior order.

The second issue, which consumed most of Scott's argument during the hearing, is that the defendants make him use a manual wheelchair, when he would prefer an electric wheelchair, and that his prosthetic legs are "cheap" and do not fit properly. First,

and foremost, Scott has failed to present medical evidence to support his arguments that he needs an electric wheelchair. Many cases have considered whether a prisoner may have sufficient medical need such that denying that prisoner a wheelchair could be deliberate indifference. Based on those cases, there is no dispute that, "the failure to provide a wheelchair for an inmate may constitute deliberate indifference to a serious medical need. . ." *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995). However, in this case, Scott *has* a wheelchair. The question is if the defendants are being deliberately indifferent by denying him an electric/motorized wheelchair. Scott testified that using a manual wheelchair hurts his hands and his back. Generally, a plaintiff is required to present competent medical evidence to support a claim of deliberate indifference. *See Alberson v. Norris*, 458 F.3d 762, 765–66 (8th Cir. 2006) (finding the failure to produce expert testimony that a lack of proper medical treatment caused inmate's death was fatal to a deliberate indifference claim, where the inmate's cause of death was pulmonary hemorrhage and renal failure resulting from Goodpasture Syndrome, a rare autoimmune disease difficult to diagnose because its symptoms present a "confusing clinical picture" and "[n]o definitive therapy exists."); *Robinson v. Hager*, 292 F.3d 560 (8th Cir. 2002) (finding that expert testimony was required to show causal link between prison officials' failure to administer blood pressure medication and an inmate's stroke). However, there is an exception to that rule if the damage caused by the deliberate indifference is visible to the untrained eye. *See Schaub*, 638 F.3d at 921, stating that:

> In this case, expert testimony on causation was unnecessary because VonWald's deliberate indifference clearly exacerbated Schaub's wounds. *See Ricketts*, 36 F.3d at 779–80 (if in a particular case relevant evidence of causation makes the issue "free from doubt," the court may find causation as a matter of law). The district court found that the seriousness of Schaub's wounds and his deteriorating condition were readily apparent to the untrained eye (and nose). Schaub

> suffered from bed sores that got infected—while serious, such sores are not susceptible to misdiagnosis, incapable of treatment, or a sophisticated medical condition resulting from myriad attenuated causes.

In this case, the question of whether an electric wheelchair is medically necessary clearly requires medical evidence. Scott's entire claim for needing an electric wheelchair is his statement that he suffers undiagnosed back and hand pain. Whether or not the use of a manual wheelchair is causing Scott pain is not a medical condition that is determinable by the naked eye. Accordingly, Scott has failed to state a claim for deliberate indifference that can survive summary dismissal.[20]

Scott's claim related to his prosthetics fails for the same reason. The defendants do not dispute that Scott has a serious medical need for prosthetic legs, and Scott does not dispute that he has received prosthetic legs. Rather, Scott testified that the prosthetics are "cheap," that they "don't fit" and that they "hurt" the remaining portion of his legs. However, Scott has not presented any medical evidence that would support a conclusion that the defendants were being deliberately indifferent by providing Scott these particular

---

[20] Other courts have reached a similar conclusion. "Pierce's allegation that he was limited to using a regular wheelchair with cushion modifications instead of his preferred choice, a 'geri-chair,' does not establish deliberate indifference. Pierce alleged that the wheelchair he was provided aggravated his condition, despite the added cushioning and protective boot provided for his left foot. However, [the defendants] concluded that because Pierce was able to propel and reposition himself in his wheelchair he was not a candidate for a geri-chair. Again, Pierce's disagreement with his treatment does not establish a constitutional claim." *Pierce v. Pitkins*, 520 F. App'x 64, 66 (3d Cir. 2013).

Additionally, although Scott alleges he is forced to use the manual wheelchair, the evidence of record suggests that Scott is often allowed to use an electric wheelchair, and only in certain circumstances is he denied access to the electric wheelchair, such as on trips outside the CCUSO facility. But, because those facts are at least somewhat disputed, they are not relevant to the current disposition because there is no evidence that an electric wheelchair is medically necessary.

prosthetics.  Whether or not these particular prosthetic legs are medically sufficient is certainly not something that is ascertainable by a lay person or obvious to the naked eye. Moreover, there is no evidence that the defendants are responsible for Scott's prosthetics. Nurse Benson testified that Scott's prosthetics are prescribed and ordered by a specialist doctor at University of Iowa Hospital.  As the Eighth Circuit Court of Appeals has stated on numerous occasions, "[a] party's "unsupported self-serving allegation[] . . . does not establish a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1088 (8th Cir. 2011).  Because Scott has failed to present any evidence that the prosthetics are not medically sufficient, and because Scott has failed to present any evidence, other than his own allegation, that the defendants are actually responsible for his prosthetics, Scott has failed to state a claim that can survive summary dismissal.

### E.     *Choice of Medical Providers*

Another issue that Scott discussed extensively both in his brief and in his testimony before Judge O'Brien is his desire to be treated by doctors not employed by CCUSO. Essentially, Scott does not trust Nurse Benson, who runs CCUSO's medical department, and wants to receive all his treatment at the University of Iowa Hospital.[21]  It is beyond any factual dispute that Scott and Nurse Benson do not have a "warm" relationship. However, there is no constitutional requirement that every detained individual get along with their medical provider.  Rather, as discussed above, the Constitution requires the government to provide medical care that is not deliberately indifferent.

The Eighth Circuit Court of Appeals has made clear that "mere disagreement with treatment decisions does not rise to the level of constitutional violation." *Jolly*, 205 F.3d

---

[21] Per CCUSO's standard policy, CCUSO patients who need specialist care are treated at the University of Iowa.

at 1096 (quoting *Rosenberg*, 56 F.3d at 37).  In a recent case, an inmate suffered a perforated bowel after he spent weeks complaining to prison officials about constipation. *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir.), *cert. denied*, 136 S. Ct. 211 (2015).  In affirming the entry of summary judgment against the inmate, the Eighth Circuit Court of Appeals stated:

> The record demonstrates the [prison health officials] did not ignore Allard's complaints or his overall condition. . . Although Allard reported his displeasure with the ordered treatments, a healthcare provider need not accept as true medical judgments offered by their patients but must make treatment decisions on the basis of many factors, only one of which is patient's input.  *Givens v. Jones*, 900 F.2d 1229, 1232 (8th Cir. 1990); *see also Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006) (holding mere disagreement with treatment decisions does not rise to [the] level of constitutional violation).

*Allard*, 779 F.3d at 772-73.  In that case, the Eighth Circuit Court of Appeals did not credit the patients' request for different treatment, even when the different treatment would have prevented grievous harm.

Scott's desire to be treated outside CCUSO is simply another way of saying that he is dissatisfied with the treatment he is receiving.  As the cases make clear, a desire to have a different type of treatment, or a different course of treatment does not establish deliberate indifference.  Nor does an institution's failure to refer an inmate to a specialist, *even when hindsight shows that referral would have helped*.  *See Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997) (stating that failing to refer an inmate to a specialist is merely a factor to consider in the deliberate indifference determination).  If a treatment disagreement does not amount to deliberate indifference and a refusal to refer a patient to a specialist is not deliberate indifference, when, in both situations, those things were medically necessary, it is clear that there is no constitutional right for a civilly committed

patient (such as Scott) to prospectively refuse CCUSO's treatment in favor of the University of Iowa. Simply put, the fact that Scott would prefer treatment at the University of Iowa does not give rise to a constitutional claim that can survive summary dismissal.[22] Accordingly, I grant the defendants' motion for summary judgment.[23]

### F.  Medically Restrictive Diet

As set out above, Judge O'Brien fully dismissed the issue related to Scott's diet on *res judicata* grounds. He affirmed that finding in several subsequent emergency hearings. The defendants have the right to make decisions about what food to provide Scott, and despite Scott's arguments to the contrary, this issue is no longer before the court.

### G.  Qualified Immunity

The defendants argue that they are entitled to qualified immunity. Because I have granted summary judgment regarding all of Scott's remaining claims, I need not reach this issue. However, I briefly explain that, even if Scott's claims survived on the merits, the defendants would be entitled to qualified immunity.

The Eighth Circuit Court of Appeals has observed that:

> Qualified immunity shields government officials from civil
> liability insofar as their conduct in performing discretionary

---

[22] The reverse is also true. As a district court in California recently noted, "[w]hile the Constitution unquestionably mandates that the State provide a prisoner adequate medical care, there is no recognized constitutional right to receive medical treatment in the same facility as housed." *Calloway v. Adams*, No. 1:11-CV-01281-RRB, 2014 WL 560808, at *2 (E.D. Cal. 2014), *reconsideration denied*, No. 1:11-CV-01281-RRB, 2014 WL 1049605 (E.D. Cal.).

[23] As Scott's companion case demonstrates, if Scott receives treatment that he believes is deliberately indifferent, he can file a 42 U.S.C. § 1983 lawsuit.

> functions "does not violate clearly established statutory or
> constitutional rights of which a reasonable person would have
> known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.
> Ct. 2727, 73 L. Ed. 2d 396 (1982). Qualified immunity
> provides "ample room for mistaken judgments," *Malley v.
> Briggs*, 475 U.S. 335, 343, 106 S. Ct. 1092, 89 L. Ed. 2d
> 271 (1986), and protects "all but the plainly incompetent or
> those who knowingly violate the law," *Id*. at 341, 106 S. Ct.
> 1092. "To overcome the defense of qualified immunity the
> plaintiff must show: '(1) the facts, viewed in the light most
> favorable to the plaintiff, demonstrate the deprivation of a
> constitutional or statutory right; and (2) the right was clearly
> established at the time of the deprivation.'" *Parrish v. Ball*,
> 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Howard v.
> Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir.
> 2009)).

*Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014). A defendant is entitled to qualified immunity if the right that defendant violated was not "clearly established" at the time of the defendant's actions. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202.

In this case, none of Scott's claims allege a violation of clearly established rights. As set out extensively above, no court has unambiguously ruled that a detained individual has an absolute right to refuse medical treatment. While state officials have a clearly established right to provide sufficient medical care, no court has ever held that a person in Scott's position would have a right to an electric wheelchair or to a particular kind of prosthetic legs. In addition, no court has ever recognized that a detained individual has a right to "shop" for a medical provider. Finally, as Judge O'Brien has set out in previous orders, almost every court that has ever considered issues related to medically restricted

diets have held that the State has broad discretion to regulate what prisoners/patients eat, so long as the food is nutritionally sufficient and not deliberately indifferent. *See Hall-Bey v. Cohn*, 86 F. App'x 200, 201 (7th Cir. 2004); *Radunz v. Muhlhausen*, 375 F. App'x 618, 620 (7th Cir. 2010); *Jackson v. Lucine*, 119 F. App'x 70, 71 (9th Cir. 2004). Accordingly, even if Scott's claim survived on the merits, the defendants would be entitled to qualified immunity.[24]

## H.      Other Issues

The defendants made two additional arguments related to personal responsibility and Eleventh Amendment immunity. Because Scott's case fails on the merits, I need not reach those issues. However, I note that the defendants recently filed a motion in limine. (docket no. 83) Because I am granting the defendants' Motion for Summary Judgment, I will deny that motion as moot.

---

[24] However, qualified immunity only applies to Scott's claim for money damages. As the Eighth Circuit Court of Appeals has stated:

> "We note that the doctrine of qualified immunity does not apply to [plaintiff's] claim[ ] for … injunctive relief." *Curtiss*, 583 Fed. Appx. at 599 (citing *Burnham v. Ianni*, 119 F.3d 668, 673 n. 7 (8th Cir. 1997) (*en banc*) (explaining that an appeal from the denial of qualified immunity implicated only liability for money damages and that qualified immunity would not protect the defendant from claims for injunctive or other equitable relief); *Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994) (stating that "qualified immunity does not apply to claims for equitable relief")).

*Mead v. Palmer*, 794 F.3d 932, 937 (8th Cir. 2015).

### III.    CONCLUSION

For the reasons discussed above, the defendants' Motion for Summary Judgment (docket no. 59) is **granted**.  This case is **dismissed**.  However, this order does not affect the companion case of C11-4055-MWB, which will proceed to trial.  Finally, the defendants' Motion in Limine (docket no. 83) is **denied** as moot.

**IT IS SO ORDERED**.

**DATED** this 17th day of December, 2015.

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA